# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASON WENTZ, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MODERNA, INC., STÉPHANE BANCEL, JAMES M. MOCK, and STEPHEN HOGE,<br><br>Defendants. | Case No. 1:24-cv-12058-IT<br><br>**CLASS ACTION**<br><br>**(LEAVE TO FILE ADDITIONAL PAGES GRANTED, DOC. NO. 70, 10/15/2025)** |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE <u>AMENDED CLASS ACTION COMPLAINT</u>

**TABLE OF CONTENTS**

**Page**

I.   PRELIMINARY STATEMENT .................................................................................. 1

II.  STATEMENT OF FACTS ....................................................................................... 3

    A.   Moderna Attempts to Position Itself as a Platform Company ............................... 3

    B.   mRESVIA Must Be Superior Because It Was Behind the Competition ................ 4

    C.   The FDA Advised Moderna that the Primary Analysis VE Was Inflated,
         Moderna Submits a Corrected Primary Analysis Reducing VE ............................ 5

    D.   Moderna Misleads Investors (and potential customers) By Representing That
         mRESVIA Had the Best Top-Line Primary Analysis VE Results ......................... 7

    E.   The Truth Emerges When the FDA Confirms mRESVIA's Vaccine Efficacy
         Was Lower Than What Defendants Had Represented ......................................... 8

    F.   Defendants Admit They Knew That mRESVIA's VE Was Not 83.7% ................. 9

III. LEGAL STANDARDS ............................................................................................. 9

IV.  ARGUMENT ......................................................................................................... 10

    A.   The Complaint Alleges Actionable Misstatements and Omissions ..................... 10

         1.   Defendants' Statements Touting 83.7% VE Were False and
              Misleading ........................................................................................... 11

         2.   Defendants' VE Representations Are Not Protected Opinions ............... 17

    B.   The Complaint Adequately Alleges Scienter ................................................... 20

         1.   The Complaint Details Defendants' Intentional or Reckless
              Misconduct Raising a Strong Inference of Scienter ............................... 21

         2.   Defendants Were Motivated to Conceal the Lower VE ......................... 26

         3.   Core Operations Doctrine Supports Scienter ........................................ 30

          4.   A Holistic Evaluation of the Allegations Confirm That the Inference
              of Scienter Is Stronger than a Competing Non-Culpable Inference ........ 31

    C.   Plaintiff Alleges Loss Causation ...................................................................... 33

    D.   Plaintiff Alleges Scheme Liability ................................................................... 34

V.    CONCLUSION ........................................................................................................ 35

**TABLE OF AUTHORITIES**

*Page(s)*

*Cases*

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
    554 F.3d 342 (3d Cir. 2009).............................................................................................. 19

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002)............................................................................... 10, 21, 22, 26

*Angelos v. Tokai Pharms.*,
    494 F. Supp. 3d. 39 (D. Mass. 2020) ............................................................................... 29

*Battle Constr. v. InVivo Therapeutics Holdings*,
    101 F. Supp. 3d 135 (D. Mass. 2015), *aff'd sub nom.*
*Ganem v. InVivo Therapeutics Holdings Corp.*,
    845 F.3d 447 (1st Cir. 2017)............................................................................................. 29

*Battle Constr. v. InVivo Therapeutics Holdings*,
    *101 F. Supp. 3d 135 (D. Mass. 2015), aff'd sub nom.*
*Ganem v. InVivo Therapeutics Holdings Corp.*,
    845 F.3d 447 (1st Cir. (1st Cir. 2017)……………………………………….…….28

*Brennan v. Zafge*
    853 F.3d 606 (1st Cir. 2017)............................................................................................. 28

*Brennan v. Zafgen, Inc.*,
    199 F. Supp. 3d 444 (D. Mass. 2016), *aff'd*,
    853 F.3d 606 (1st Cir. 2017)............................................................................................. 25

*Brill v. Invivyd, Inc.*,
    2024 WL 4228832 (Dist. Mass. Sept. 18, 2024) .............................................................. 18, 20

*Brumbaugh v. Wave Sys. Corp.*,
    416 F. Supp. 2d 239 (D. Mass. 2006) .............................................................................. 34

*Celano v. Fulcrum Therapeutics, Inc.*,
    2025 WL 928783 (D. Mass. Mar. 27, 2025)...................................................................... 28

*Collier v. ModusLink Global*,
    *Sols*, 9 F. Supp. 3d 61 (D. Mass. 2014) ............................................................. 20, 28, 30, 35

*Constr. Ind. & Laborers Joint Pension Tr. v. Carbonite*,
    22 F.4th 1 (1st Cir. 2021)....................................................................................... passim

*Corban v. Sarepta Therapeutics*,
   868 F.3d 31 (1st Cir. 2017) .................................................................... 15, 24, 25, 28

*Crowell v. Ionics, Inc.*,
   343 F. Supp. 2d 1 (D. Mass. 2004) ...................................................................... 30

*Dahhan v. OvaScience, Inc.*,
   321 F. Supp. 3d 247 (D. Mass. 2018) ................................................................... 31

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ........................................................................................... 33

*Fire and Police Pension Ass'n of Colorado v. Abiomed, Inc.*,
   778 F.3d 228 (1st Cir. 2015) ........................................................................... 15, 24

*Ganem v. InVivo Therapeutics Holdings Corp.*,
   845 F.3d 447 (1st Cir. 2017) ............................................................................... 12

*Gerneth v. Chiasma, Inc.*,
   2018 WL 935418 (D. Mass. Feb. 15, 2018) ...................................................... 15, 16

*In re Ariad Pharms, Inc. Sec. Litig.*,
   842 F.3d 744 (1st Cir. 2016) ............................................................................... 12

*In re Biogen Sec. Litig.*,
   179 F.R.D. 25 (D. Mass. 1997) ............................................................................ 24

*In re Biogen Sec. Litig.*,
   857 F.3d 34 (1st Cir. 2017) ................................................................................. 12

*In re Bos. Sci. Sec. Litig.*,
   646 F. Supp. 3d 249 (D. Mass. 2022) ................................................................... 28

*In re Cabletron Sys., Inc.*,
   311 F.3d 11 (1st Cir. 2002) ............................................................................. 10, 26

*In re Credit Suisse-AOL Sec. Litig.*,
   465 F. Supp. 2d 34 (D. Mass. 2006) ..................................................................... 33

*In re Delcath Sys., Inc. Sec. Litig.*,
   36 F. Supp. 3d 320 (S.D.N.Y. 2014) ..................................................................... 16

*In re Genzyme Corp. Sec. Litig.*,
   754 F.3d 31 (1st Cir. 2014) ................................................................................. 26

*In re Genzyme Corp. Sec. Litig.*,
   2012 WL 1076124 (1st Cir. 2014),
   *aff'd*, 754 F.3d 31 (1st Cir. 2014) ....................................................................... 12

ii

*In re iRobot Corp. Sec. Litig.*,
  527 F. Supp. 3d 124 (D. Mass. 2021) ................................................................ 30

*In re Karyopharm Therapeutics Sec. Litig.*,
  552 F. Supp. 3d 77 (D. Mass. 2021) .................................................................. 20

*In re Sepracor, Inc. Sec. Litig.*,
  308 F. Supp. 2d 20 (D. Mass. 2004) .................................................................. 15

*In re Stone & Webster, Inc., Sec. Litig.*,
  414 F.3d 187 (1st Cir. 2005) ................................................................................ 9

*In re Transkaryotic Therapies, Inc. Sec. Litig.*,
  319 F. Supp. 2d 152 (D. Mass. 2004) ...................................................... 13, 24, 31

*Kader v. Sarepta Therapeutics, Inc.*,
  887 F.3d 48 (1st Cir. 2018) ........................................................ 20, 24, 25, 28

*Kader v. Sarepta Therapeutics, Inc.*,
  2017 WL 72396 (D. Mass. 2017), *aff'd*,
  887 F.3d 48 (1st Cir. 2018) ................................................................................ 25

*Karth v. Keryx Biopharmaceuticals, Inc.*,
  6 F.4th 123 (1st Cir. 2021) ................................................................................. 16

*Leavitt v. Alnylam Pharms., Inc.*,
  525 F. Supp. 3d 259 (D. Mass. 2021) ................................................................ 25

*Leung v. bluebird bio, Inc.*,
  599 F. Supp. 3d 49 (D. Mass. 2022) .................................................................. 23

*Loc. No. 8 IBEW Ret. Plan & Trust v. Vertex Pharm., Inc.*,
  838 F.3d 76 (1st Cir. 2016) ................................................................................ 23

*Lorenzo v. SEC*,
  587 U.S. 71 (2019) ....................................................................................... 34, 35

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) .............................................................................................. 9

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ...................................................................................... 17, 18

*Paice v. Aldeyra Therapeutics*,
  2025 WL 815065 (D. Mass. Mar. 14, 2025) ................................................. 23, 26

*Phantom Touring, Inc. v. Affiliated Publ'ns*,
  953 F.2d 724 (1st Cir. 1992) .............................................................................. 17

*Pizzuto v. Homology Meds., Inc.*,
  2024 WL 1436025 (D. Mass. Mar. 31, 2024) ................................................................. 20, 29

*Premca Extra Income Fund LP v. iRobot Corp.*,
  763 F. Supp. 3d 121 (D. Mass. 2025), *appeal filed*,
  25-1192 (1st Cir. Feb. 25. 2025) ...................................................................................... 31

*Republic Maximal LLC v. Romulus Capital Partners II, LLC*,
  2024 WL 3169798 (D. Mass. 2024), *adhered to by*
  2024 WL 3834940 (D. Mass. Aug. 15,2024) ..................................................................... 27

*Rosen v. Textron Inc.*,
  321 F. Supp. 2d 308(D.R.I. 2004) ............................................................................... 22, 23

*Sanders v. AVEO Pharm., Inc.*,
  2015 WL 1276824 (D. Mass. Mar. 20, 2015) ..................................................................... 24

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016) .......................................................................................... 15

*SEC v. Johnston*,
  986 F.3d 63 (1st Cir. 2021) ............................................................................................ 15

*SEC v. Lemelson,*
  532 F. Supp. 3d 30 (D. Mass. 2021) .............................................................................. 17

*SEC v. Liberty,*
  2021 WL 664834 (D. Me. Feb. 19, 2021) ........................................................................ 35

*SEC v. Sharp,*
  626 F. Supp. 3d 345 (D. Mass. 2022) ............................................................................. 35

*Shash v. Biogen, Inc.*,
  84 F.4th 1 (1st Cir. 2023) ........................................................................................ passim

*Shih v. Amylyx Pharms., Inc.*,
  2025 WL 2807756 (D. Mass. Sept. 30, 2025) .............................................................. 33, 34

*Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*,
  775 F. Supp. 2d 227 (D. Mass. 2011) ............................................................................. 33

*State Tchrs. Ret. Sys. of Ohio v. Charles River Lab'ys Int'l, Inc.*,
  152 F.4th 1 (1st Cir. 2025) ....................................................................................... passim

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. (2007) ....................................................................................... 20, 22, 29

*Thant v. Karyopharm Therapeutics, Inc.*,
   43 F.4th 214 (1st Cir. 2022).......................................................................................... 15

*Whitehead v. Inotek Pharms.*,
   2018 WL 4732774 (D. Mass. June 27, 2018) .......................................................... 29

*Yan v. ReWalk Robotics*,
   973 F.3d 22 (1st Cir. 2020)............................................................................. 15, 24, 25

Statutes

15 U.S.C. §78a...................................................................................................................... vi.

15 U.S.C. §78u-4(b)(1)(B)................................................................................................... 11

Regulations

17 C.F.R. § 240.10b–5(b) ................................................................................................... 10

**TABLE OF ABBREVIATIONS AND GLOSSARY**

| ¶ | Paragraphs of the Complaint |
|---|---|
| Abrysvo | Pfizer's RSV vaccine |
| ACIP | Centers for Disease Control and Prevention Advisory Committee on Immunization Practices |
| Arexvy | GSK's RSV vaccine |
| Bancel | Defendant Stéphane Bancel |
| BLA | Biologics License Application |
| BLA Review Memo | The BLA Clinical Review Memo dated May 29, 2024 |
| Class Period | February 15, 2024 through May 31, 2024, inclusive |
| Company | Moderna, Inc. |
| Complaint | Amended Class Action Complaint, filed August 25, 2025 (Doc. No. 62) |
| ConquerRSV Trial | Moderna's clinical study to evaluate the safety and efficacy of mRESVIA |
| Defendants | Defendants Moderna, Inc., Stéphane Bancel, James M. Mock, and Stephen Hoge |
| Def. Ex._ or Exhibit_ | Exhibits to the Declaration of Adam Rosenfeld (Doc. No. 72) |
| Exchange Act | Securities Exchange Act of 1934, 15 U.S.C. §78a et seq. |
| FDA | US Food and Drug Administration |
| GSK | GSK plc |
| Individual Defendants | Bancel, Mock, and Hoge |
| Hoge | Defendant Stephen Hoge |
| McKinsey Study | 2014 McKinsey & Company study titled "Pharma's first-to-market advantage" |
| Moderna | Moderna, Inc. |
| Mock | Defendant James M. Mock |
| Motion | Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Class Action Complaint (Doc. No. 73) |
| mRESVIA | Moderna's RSV vaccine, also called "mRNA-1345" |
| mRNA-1345 | mRESVIA |

vi

| MTD at _ | Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Class Action Complaint (Doc. No. 73) |
|---|---|
| NEJM | New England Journal of Medicine |
| Pfizer | Pfizer Inc. |
| Plaintiff | Lead Plaintiff Pak Sa Kim |
| Plaintiff's Ex._ | Exhibits to the Declaration of Michael S. Bigin (Doc. No. 74) |
| RSV | Respiratory Syncytial Virus |
| RT-PCR | Reverse transcriptase–polymerase chain reaction test |
| SEC | U.S. Securities and Exchange Commission |
| Section 10(b) | Section 10(b) of the Exchange Act |
| Section 20(a) | Section 20(a) of the Exchange Act |
| Summary Basis | May 31, 2024 Summary Basis for Regulatory Action— mRESVIA |
| VE | Vaccine efficacy |

## I.    PRELIMINARY STATEMENT

Defendants represented that mRESVIA was the most effective RSV vaccine ever created. Early efficacy analysis sponsored by Moderna showed a vaccine efficacy (VE) of 83.7%, beating all competitors. The FDA, however, reviewed that data and rejected it. According to the BLA Review Memo made public after the Class Period:[1]

> On January 25, 2024, due to inconsistencies in the datasets submitted for [the mRESVIA] Study P301, FDA requested that the Applicant [Moderna] … submit updated datasets for FDA review.
>
> ****
>
> The applicant initially submitted preliminary results from their interim analysis of Study P301, citing VEs of 83.7% …. The updated datasets, submitted to the BLA on February 26, 2024, identified additional RSV cases with onset prior to data cutoff which met the study case definition. The primary efficacy analyses reflecting the updated datasets … [is a VE of 78.7%]. [¶¶57, 61.]

The Class Period begins on February 13, 2024 when Defendants recalculated the VE at 78.7% using the corrected datasets. Nevertheless, Defendants continuously misled investors by falsely representing mRESVIA's VE was still 83.7% when they knew (or at least recklessly disregarded) that the primary efficacy analysis showed VE was only 78.7%. This difference was especially material because the lower VE caused mRESVIA to lose its top spot as the most effective RSV vaccine and prevented it from displacing the competition. Rather than concede to the market that the FDA had rejected the faulty underlying data supporting an inflated 83.7% VE, Defendants concealed this information. Investors continued to buy Moderna securities at inflated prices until the FDA approved mRESVIA at the lower, less competitive, 78.7% VE causing Moderna's share price to drop approximately 6% and erasing millions in shareholder value.

---

[1] The Class Period is February 15, 2024 through May 31, 2024 inclusive. All capitalized terms shall have the same meanings assigned to them in the Table of Abbreviations and Glossary.

1

The Complaint amply satisfies Rule 9(b) and PSLRA pleading standards by alleging particularized facts drawn principally from FDA documents and Defendants' later admissions. These facts demonstrate how Defendants' statements touting the inflated VE were false and misleading and provide a strong inference of scienter.

The Motion relies on the typical arguments that have plagued weaker Rule 10(b) complaints based on blinded FDA studies and "defendants must have known" allegations. The Complaint cures the problems raised by Defendants' authorities and arguments by relying on official FDA records containing specific details of when and how Defendants learned the FDA rejected the 83.7% VE. The FDA reports that the 83.7% VE was superseded by Moderna's own corrected data showing a 78.7% VE for the same data cutoff, using the same primary analysis protocol. Claims that Defendants justifiably believed they could continue to publish the inflated VE ring hollow given the facts alleged. Arguments asserting that there was a scientific difference of opinion cannot apply to the objective data calculations at issue. Defendants also did not warn investors that the FDA disputed the VE data. According to the FDA, Moderna and the FDA agreed 78.7% was the correct VE for mRESVIA in February 2024.

In a tacit admission that the Complaint adequately alleges a securities fraud claim, Defendants support their arguments with unauthenticated and extrinsic documents. These are impermissible for a Rule 12 motion and should not be relied on by the Court as stated in the separate Motion to Strike being filed contemporaneously. Exhibit 22 is particularly surprising. This writing claims to be a March 2024 memo to the FDA complaining that using correct data is an improper *post hoc* analysis. That false assertion becomes the backbone of Defendants' Motion. But the FDA seems to have no record of this document. And the BLA Review Memo explicitly disputes it, stating that the additional cases met the case definition and the data cutoff required by

2

the study protocol. That was the same protocol for the earlier analysis. Understanding the context surrounding Defendants' arguments will be an issue for formal discovery, currently barred by the PSLRA because Defendants filed their Motion instead of an answer.

While the facts alleged in the Complaint based on the FDA documents meet the pleading requirements, the fact that Defendant Hoge admitted after the Class Period that Defendants agreed with the FDA's 78.7% VE for mRESVIA buttresses scienter. The Complaint also sufficiently alleges that mRESVIA was the key product and core business of Moderna. Additionally, the Complaint's motive allegations show scienter because they are specific to Defendants who were motivated to differentiate mRESVIA as superior such that it would replace waning Spikevax revenue, validate the Company's thesis as a platform Company, and avoid a weak bargaining position with potential buyers. Taken collectively, Plaintiff's allegations support a cogent and compelling inference of scienter that far outweighs a non-culpable inference.

Defendants' remaining Rule 10b-5(b) attack that loss causation was not alleged fails since there are actionable statements and the Complaint details the economic loss caused by the fraud. Defendants also miss their mark claiming the Complaint does not adequately allege Section 20(a) liability or Rule 10b-5(a)(c) scheme liability. These arguments are belied by the facts, which demonstrate Defendants engaged in a scheme to conceal the 78.7% VE for the entirety of the Class Period. Accordingly, Defendants' motion should be denied in full.

## II.    STATEMENT OF FACTS

### A.    Moderna Attempts to Position Itself as a Platform Company

Moderna's first marketable product was its COVID-19 vaccine, Spikevax, which the Company began public distribution of in 2020. ¶25. Spikevax was the Company's principal source of revenue prior to and throughout the Class Period. ¶26. In 2022, Moderna reported annual revenue of $19.3 billion, of which $18.4 billion was from Spikevax. ¶26. As the COVID-19

3

pandemic waned, demand for Spikevax, Moderna's only commercially available product, was plummeting. ¶27. In 2023, Moderna suffered a 65% decrease in annual revenue compared to the prior year, reporting just $6.8 billion in revenue, of which $6.7 billion was from Spikevax. ¶¶27-28. Moderna's solution to replace its $10 billion revenue deficit was to position the Company as a platform company with multiple FDA approved products, the first of which was mRESVIA. ¶29.

Prior to the Class Period, Defendant Bancel highlighted the importance of Moderna executing on its strategy to become more than a "one-drug company." Bancel explained that Moderna was "extremely focused on expanding the platform." ¶33. Defendant Hoge echoed this sentiment advising investors that the Company's forthcoming products, namely mRESVIA, will be Moderna's new "core underlying business." ¶34. To that end, Moderna detailed its strategic plan of being a platform company with new FDA approved products, the first of which was mRESVIA, which would lead the Company into its next stage. ¶¶34-35.

**B.    mRESVIA Must Be Superior Because It Was Behind the Competition**

While mRESVIA was in development, there were no FDA-approved vaccines available to prevent RSV. ¶37. With no vaccine on the market, a multi-billion-dollar opportunity in the respiratory vaccine space was up for grabs, and the first company to launch its product would stand to capture a huge portion of the total addressable market. ¶37. Being first to obtain FDA approval for a product for a given application is the most significant factor for capturing market share. ¶38. Numerous studies confirm the first-to-market advantage. For example, the McKinsey Study explained that all else being equal, the first entrant on average achieves 39% market share, while the third entrant on average achieves just 29% market share. ¶39. The McKinsey Study concluded by highlighting that a late market entrant can still capture market share if it offers a superior product. ¶39; *see also* ¶40 (describing a 2025 study that reached the same conclusion).

mRESVIA's development lagged behind competitors' products in the race for FDA approval. ¶41. By November 2022, Pfizer and GSK had already submitted applications for FDA approval of their RSV vaccines, and Moderna's ConquerRSV Trial of mRESVIA remained ongoing. ¶¶44-46. Defendants knew that even if the ConquerRSV Trial was successful and mRESVIA was granted FDA approval, they were fighting an uphill battle because mRESVIA would be the third market entrant, and thus the Company would likely fail to capture significant market share, unless it could differentiate mRESVIA as the superior vaccine. ¶46.

On January 17, 2023, Moderna reported positive topline data from the ConquerRSV Trial, stating in a press release that mRESVIA's "primary efficacy endpoints have been met, including vaccine efficacy (VE) of 83.7%" and that "[b]ased on these results, Moderna intends to submit for regulatory approval in the first half of 2023."[2] ¶47. The 83.7% VE figure was based on 64 positive cases of RSV (55 in placebo group; 9 in mRNA-1345 group) that accrued before the November 30, 2022 data cutoff date (DCO). *Id.*

At the end of May 2023, the FDA had already approved two competing RSV vaccines. ¶¶49-51. The VE of the market leader's primary analysis was 82.6% VE. ¶51. As the third entrant, to differentiate itself, capture market share, and generate significant revenues, Moderna needed mRESVIA to be approved by the FDA with a primary analysis VE greater than 82.6%. *Id.*

### C.    The FDA Advised Moderna that the Primary Analysis VE Was Inflated, Moderna Submits a Corrected Primary Analysis Reducing VE

On September 12, 2023, Moderna submitted its completed BLA, claiming a primary analysis VE of 83.7%, based on the November 30, 2022 DCO. ¶53. On January 25, 2024, the FDA advised Defendants that it had identified inconsistencies and discrepancies with the data

---

[2] VE figures refer to VE against RSV-LRTD with $\geq 2$ symptoms. *See, e.g.*, ¶¶9, 47, 69, 80, 81.

supporting the 83.7% VE and required the Company to submit a corrected primary analysis dataset. ¶¶56-58. The FDA's January 25, 2024 request for corrected data informed Defendants that the original data was insufficient and that FDA approval (and mRESVIA's product label) would be based on the corrected datasets. ¶58.

Complying with this request, on February 13, 2024, Defendants extracted a dataset for the same primary efficacy analysis they had previously submitted, using the same November 30, 2022 DCO. ¶¶59, 63. The updated dataset identified an additional 21 confirmed positive cases of RSV that met the study case definition and occurred before the DCO. ¶59.[3] These cases accrued before the November 30, 2022 DCO but were not included in Moderna's original dataset prior to the start of the Class Period. ¶59. The primary efficacy analysis pursuant to the agreed-upon study documents, now showed 85 total cases of RSV (70 placebo; 15 MRNA-1345), a 34% increase in total positive cases, a 27% increase in placebo group cases, and a staggering 67% increase in mRESVIA group cases from the original dataset, resulting in a VE of 78.7%. *Id.* Defendants knew by this date that the 83.7% VE figure was false. ¶63.

On February 26, 2024, Defendants submitted the corrected primary analysis dataset to the FDA. ¶¶60-62. The FDA's evaluation of mRESVIA, memorialized in the BLA Review Memo, states that: "The updated datasets, submitted to the BLA on February 26, 2024, identified additional RSV cases with onset prior to data cutoff which met the study case definition. The primary efficacy analyses reflecting the updated datasets are presented in Table 8 and Table 9 above." ¶¶61-62. Those tables showed the primary analysis for mRESVIA was 78.7% VE. Similarly, the FDA confirmed that: "The updated data were used in the primary and additional

---

[3] The Complaint inadvertently understated this figure and refers to 20 additional cases of RSV. *See, e.g.,* ¶81; *compare* BLA Review Memo at 29 (stating there were 21 additional cases).

efficacy analyses and identified additional RSV cases with onset prior to data cutoff which met the study case definition. The additional identified cases were incorporated into the estimates of vaccine efficacy in this review memorandum." *Id.*; Plaintiff's Ex. 2 (BLA Review Memo), Doc. No 74-2 at 3.

The FDA consistently reported that the additional 21 cases included in the 78.7% VE calculation "met the study case definition" for the primary analysis. ¶61; Doc. No. 74-2, at 29 ("The BLA submission includes data from the pre-specified interim analysis of the primary efficacy endpoints (considered the primary analysis), which includes cases of first episode of RSV-LRTD through the data cutoff date of November 30, 2022" with a 78.7% VE). The BLA Review Memo has no record of any objection by Moderna to 78.7% VE and no record of a "*post hoc*" analysis or expansion of the primary efficacy endpoints. Only the 78.7% VE is permitted on mRESVIA's label and advertisements according to the FDA.

**D.    Moderna Misleads Investors (and potential customers) By Representing That mRESVIA Had the Best Top-Line Primary Analysis VE Results**

Defendants misled investors by touting mRESVIA's 83.7% VE throughout the Class Period, when they knew that the FDA rejected the data supporting the 83.7% VE. *See generally* Complaint, Section V. Each of these statements were misleading when made because unbeknownst to investors, Defendants knew, recklessly disregarded, and omitted that: (i) the FDA had identified inconsistencies with the dataset supporting the 83.7% VE; (ii) the FDA had requested that Moderna submit updated datasets for the primary efficacy analysis; (iii) by February 13, 2024, Moderna had corrected the datasets and identified 21 additional positive cases of RSV that met the study case definition, occurred prior to the DCO, and must be accounted for in the primary analysis VE; and (v) the corrected data showed that mRESVIA had a 78.7% VE.

The difference between reporting a VE of 83.7% and 78.7% severely limited Moderna's ability to generate meaningful revenue from mRESVIA. As the third entrant into the market, Moderna needed to differentiate mRESVIA as superior to earlier market entrants to compete effectively and capture meaningful market share. ¶¶65, 112-113. Reporting 83.7% VE made mRESVIA appear superior to GSK's Arexvy, positioning it as a top choice, but at just 78.7% VE, mRESVIA offered no competitive advantage. *Id*. Revealing the 78.7% VE prior to FDA approval would weaken the Company's bargaining position with buyers and prevent mRESVIA from capturing any significant market share. ¶¶111-119.

### E.    The Truth Emerges When the FDA Confirms mRESVIA's Vaccine Efficacy Was Lower Than What Defendants Had Represented

On May 31, 2024, Moderna issued a press release announcing mRESVIA had secured FDA approval, but with a VE of only 78.7%. ¶74. This VE was surprisingly lower than the 83.7% VE that Defendants had represented to investors, and importantly, lower than the market-leading 82.6% efficacy rate. *Id.* The press release incorporated the FDA-approved label that required Moderna to advertise mRESVIA with its actual 78.7% VE. The incorrect 83.7% VE was not permitted to be advertised. *Id*.[4]

A Seeking Alpha market analyst published a May 31, 2024 article confirming that investors quickly realized they had been misled by Moderna's inflated VE representations. ¶76. The analyst explained that, despite the FDA approval, "[Moderna's] shares traded lower amid concerns over a potentially lower-than-expected efficacy indicated in mRESVIA's label." *Id*. On news of the lower VE, Moderna's stock price fell $8.94 per share, or 5.9%. ¶75.

---

[4] *See* https://www.fda.gov/media/179005/download?attachment.

**F.    Defendants Admit They Knew That mRESVIA's VE Was Not 83.7%**

Less than two weeks later, on June 10, 2024, Defendant Hoge, presumably alluding to a non-public communication Moderna had with the FDA immediately following February 13, 2024, admitted that Moderna agreed with the FDA about including the additional positive RSV cases in the primary analysis, stating that, "during the process of the review with the FDA, they asked us to include a set of cases, about 20 cases that were not confirmed at the time of the primary analysis. … because it added about 20 more cases to that primary analysis, we ultimately agreed with the agency to include those." ¶60.

Moderna was unable to generate significant revenue from mRESVIA and predictably failed to capture significant market share. ¶78. For 2024 Moderna's competitors, Pfizer and GSK reported $755 million and $732 million, from RSV vaccines respectively, while Moderna's $25 million mRESVIA revenue represented a 1.6% market share. *Id.* First quarter of 2025 was even worse. Moderna had a 1% market share with just $2 million in revenue from mRESVIA. *Id.*

## III.    LEGAL STANDARDS

When considering a motion to dismiss under Rule 12(b)(6) for a Complaint subject to the PSLRA, the Court must accept all well-pleaded factual allegations as true, and "read the Complaint in the manner most favorable to the plaintiff, drawing all reasonable inferences in the plaintiff's favor." *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 200 (1st Cir. 2005). The complaint "need only allege enough facts to state a claim to relief that is plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011).[5] "Although the pleading requirements

---

[5] Emphasis is added and internal citations and quotations are omitted unless otherwise noted.

under the PSLRA are strict, they do not change the standard of review for a motion to dismiss."

*Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir. 2002).[6]

## IV.    ARGUMENT

Defendants argue that Plaintiff has not sufficiently alleged: (a) a material misrepresentation or omission; (b) scienter; or (c) loss causation. As discussed below, the Complaint adequately alleges each of these elements. Defendants' motion should be denied.

### A.    The Complaint Alleges Actionable Misstatements and Omissions

The Complaint pleads the first element of a Section 10(b) claim—a material misrepresentation or omission. To establish a material misrepresentation or omission, Plaintiff must show that Defendants made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading. *See* 17 C.F.R. § 240.10b–5(b). A fact or omission is material if "a reasonable investor would have viewed it as having significantly altered the total mix of information made available." *See State Tchrs. Ret. Sys. of Ohio v. Charles River Lab'ys Int'l, Inc.*, 152 F.4th 1, 34 (1st Cir. 2025). "Information which would have assumed significance in the deliberations of a reasonable shareholder is material." *Id*.[7]

The Complaint identifies each false or misleading statement with the specificity required by Rule 9(b) and the PSLRA by detailing the who, what, where, and when of each alleged misstatement. ¶¶80-81, 83-85, 87-88, 90-91, 93-94, 96-98, 100-101. The Complaint also explains

---

[6] They certainly "do not require a plaintiff to plead evidence." *In re Cabletron Sys., Inc.*, 311 F.3d 11, 33 (1st Cir. 2002). To the contrary, "courts will allow private securities fraud complaints to advance past the pleadings stage when some questions remained unanswered, provided the complaint as a whole is sufficiently particular to pass muster under the PSLRA." *Id*. at 32.

[7] "In general, the materiality of a statement or omission is a question of fact that should normally be left to a jury rather than resolved by the court on a motion to dismiss." *Cabletron*, 311 F.3d at 34. "Thus, [courts] review the complaint only to determine that it pleads the existence of such statements and presents a plausible jury question of materiality." *Id*.

how and why each was materially false and misleading when made, identifying the factual sources that support Plaintiff's claims of falsity; specifically, the BLA Review Memo, Summary Basis, and Defendants' own admissions. *See id.*; ¶¶56-59, 60-61, 63-64, 74; 15 U.S.C. §78u-4(b)(1)(B). These sources are sufficient to show that Defendants' representations that mRESVIA's VE was 83.7% were false and misleading when made.

**1.      Defendants' Statements Touting 83.7% VE Were False and Misleading**

Defendants' representations throughout the Class Period that mRESVIA's VE was 83.7% were false and misleading because at the time the statements were made, Defendants knew that the VE was 78.7%:

- On January 25, 2024, the FDA notified Moderna that it rejected the data purportedly supporting the 83.7% VE because of inconsistencies in the data and requested Moderna to submit corrected datasets for FDA review (¶¶56-58, citing BLA Review Memo);

- On February 13, 2024, pursuant to the FDA's request, Moderna extracted corrected datasets, which identified and included 21 additional RSV cases that met the study definition, accrued prior to the DCO, and when accounted for reduced the VE to 78.7% (¶¶59, 63, citing Summary Basis);

- On February 26, 2024, Defendants submitted the corrected datasets with the 21 additional RSV cases and 78.7% VE, to the FDA (¶61, citing BLA Review Memo);

- On May 31, 2024, Moderna admitted that mRESVIA had a 78.7% VE (¶74, citing Moderna Press Release); and

- On June 10, 2024, Hoge admitted that Defendants knew the VE was lower than what they represented to investors because Moderna had agreed with the FDA to include the additional RSV cases in the primary analysis which reduced the VE to 78.7% (¶¶60, 64, citing Moderna Conference Call).

Plaintiff is not merely alleging that Defendants' 83.7% VE representations were false because they later turned out to be different than the FDA's "subsequent determination." MTD at 20-21. The Complaint alleges facts showing that Defendants knew when the statements were made that the FDA had rejected the data supporting the 83.7% VE and that the correct VE was 78.7%.

11

This is not "fraud-by-hindsight." *See In re Ariad Pharms, Inc. Sec. Litig.*, 842 F.3d 744, 752-53 (1st Cir. 2016) (it was "knowingly or recklessly misleading" for the defendants to express optimism about a drug's chances for approval with a favorable label weeks after learning that the FDA rejected the company's proposed label due to safety disclosures).[8]

Defendants claim the stated 83.7% VE was "accurate and true," contending that their representations were not false because: (1) they were entitled to rely the on FDA-rejected dataset calculations; and (2) Moderna privately disagreed with the FDA's required corrections. MTD at 20-23. Neither contention has merit.

Defendants' first defense can be dismissed at the outset because it rests on a fundamental mischaracterization of Plaintiff's allegations. Plaintiff does not allege that the NEJM-published primary analysis did not show an 83.7% VE based on the 64 known cases when that analysis was conducted in 2023. *See* MTD at 20. Rather, Plaintiff alleges that the FDA rejected that analysis and informed Moderna in 2024 that there were inconsistencies with that original primary analysis data. Moderna then created and corrected the datasets and learned the VE was materially incorrect because the corrected data included 21 additional positive cases. Defendants no longer had any

---

[8] Defendants' pre-Class Period knowledge that the FDA rejected the datasets supporting the 83.7% VE squarely distinguishes this case from Defendants' authorities. *See* MTD at 21, n. 16; *See In re Genzyme Corp. Sec. Litig.*, 2012 WL 1076124, at *11 (1st Cir. 2014) (plaintiffs failed to identify any facts showing that the defendants knew that they would not timely address the FDA's concerns), *aff'd*, 754 F.3d 31 (1st Cir. 2014); *Ganem v. InVivo Therapeutics Holdings Corp.*, 845 F.3d 447, 457 (1st Cir. 2017) (plaintiffs failed to allege "*any*" facts showing that the defendants knew they would be unable to meet the timeline represented to investors due to undisclosed conditions the FDA placed on its study); and *In re Biogen Sec. Litig.*, 857 F.3d 34, 44 (1st Cir. 2017) (plaintiffs relied only on statements made "well after the end of the Class Period that [did] not provide particularized insight into the defendants' knowledge at the time of the alleged misstatements").

reasonable basis to continue touting an 83.7% VE.[9] What was critical to Moderna—and what investors cared about—was what VE the FDA was going to approve for labeling. *See In re Transkaryotic Therapies, Inc. Sec. Litig.*, 319 F. Supp. 2d 152, 160 (D. Mass. 2004) (rejecting argument that statements touting efficacy were not false because respected medical journals published favorable results and Replagal was approved in several foreign jurisdictions).

Defendants further argue that since their statements touting the 83.7% VE were qualified as being from the "primary" or "per protocol analysis," they were not false because they referred to the first analysis conducted. MTD at 20. But these words cannot be read out of context. *See Charles River*, 152 F.4th at 11-12 ("context and relevance are important" when determining whether reasonable investors would have inferred the qualifications the defendants' claimed rendered their statements accurate). The "primary analysis" meeting the "primary efficacy endpoints" and "per protocol analysis" referred to quantifying data for the principal analysis used by the FDA for approval. Investors knew the primary analysis quantified VE for cases that met the study definition and accrued before the DCO. *See, e.g.* ¶80 (Moderna false slide noting DCO "for primary analysis was 30November2022"). The primary analysis VE is critical and goes on every FDA-approved product label. It is how comparisons with competitors' products are made. The Executive Summary of the BLA Review Memo confirms that 78.7% VE was the corrected primary analysis per study protocol: "***The updated data were used in the primary*** and additional ***efficacy analyses*** and identified additional RSV cases ***with onset prior to data cutoff which met the study case definition***. The additional identified cases were incorporated into the estimates of vaccine

---

[9] To be clear, the pre-Class Period NEJM-published primary analysis 83.7% VE was always incorrect because it was based on incorrect data. This case is about Defendants' Class Period misrepresentations *after* Defendants knew that the data supporting that figure was incorrect.

efficacy ….” *See also* Doc. No. 72-24 at 3, 20-22, 26, 29, 32, 74.[10] Defendants knew or recklessly disregarded that the 83.7% VE was an incorrect primary analysis rate. Accordingly, Defendants' statements repeating the inflated 83.7% VE — and implying it was correct based on a study of the wrong data – misled investors.

Defendants also assert the false premise that the FDA changed the study protocol by performing an improper "post hoc" analysis and included positive RSV cases that were not "confirmed" by the November 30, 2022 DCO. MTD at 20-21. There are no verifiable facts supporting Defendants' assertions.[11] To the contrary, the BLA Review Memo, the Summary Basis, and the FDA-approved label never refer to the corrected dataset as a "*post-hoc*" analysis. The FDA's records show that the same "primary analysis," using the same study protocol, with the same DCO, required inclusion of and accounting for the 21 additional cases that met the predefined study protocol's case definition. The "[c]ase definition was based on eligible symptoms onset within a timeframe of +/- 14 days from positive RSV RT-PCR *collection* date." Doc. No.74-2 at 29-30, n. d; *see also* Doc. No.74-1 at 20 (same).[12] The 21 additional cases occurring before the DCO fit the case definition and resulted in correcting the primary analysis to 78.7% VE. Accordingly, the 83.7% VE was always wrong, and certainly known by Defendants to be wrong by February 13, 2024 and throughout the Class Period.

---

[10] Defendants note that Ex. 25 (Doc. No. 72-25), references the 83.7% VE (MTD at 20), but that document is dated September 11, 2023, which is prior to the Class Period and predates the FDA's receipt of the updated datasets showing 78.7% VE. *Id.* at 1. Additionally, Ex. 25 is a safety review. The FDA's efficacy review is in the BLA Review Memo, which is controlling. *See* ¶¶55-60.

[11] *See* Plaintiff's Motion to Strike Defendants' Exhibits 17-22; 32-37; and 41.

[12] The Motion suggests Defendants wrongly used only a 5-day timeframe for the 83.7% VE primary analysis dataset. MTD at 14. That claim, however, is not alleged and cannot be confirmed. The Statistical Review at Exhibit 26 (MTD at 17) notes that correct data was unavailable due to "operational reasons," meaning Moderna did not operate consistent with the study protocol when first collecting data for the November 30, 2022 DCO.

Defendants also cannot avoid liability claiming they told half-truths about mRESVIA's VE while concealing that the FDA had advised Moderna that it would not accept the datasets that supported the 83.7% VE. The VE statements "paint[] a materially false picture in what they say because of what they omit." *See Charles River*, 152 F.4th at 11 (quoting *SEC v. Johnston*, 986 F.3d 63, 72 (1st Cir. 2021)). Defendants did not have to publicize mRESVIA's VE, but once they chose to highlight mRESVIA's former 83.7% VE during the Class Period, the securities laws required that they also disclose the corrected primary analysis VE of 78.7%. *See Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) ("Once defendants choose to tout" positive information to the market, "they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information."); *In re Sepracor, Inc. Sec. Litig.*, 308 F. Supp. 2d 20, 33-34 (D. Mass. 2004) (defendants were obligated to disclose known facts that undermine their statements); *Gerneth v. Chiasma, Inc.*, 2018 WL 935418 *5 (D. Mass. Feb. 15, 2018) (concealing that the FDA had expressed concerns about approval rendered optimistic statements about approval misleading).[13]

The FDA's rejection of the data underlying the 83.7% VE was highly material to investors since the VE was critical to mRESVIA's success and the FDA was the regulatory body approving the VE for the product label. The clear implication of Defendants' statements was that mRESVIA

---

[13] Defendants' cited authority is inapposite. MTD at 23. *See Thant v. Karyopharm Therapeutics, Inc.*, 43 F.4th 214, 222-23, 226 (1st Cir. 2022) (failure to disclose every adverse event not misleading because the defendants disclosed the FDA's concerns and selinexor's most-prevalent risks); *Fire and Police Pension Ass'n of Colorado v. Abiomed, Inc.*, 778 F.3d 228, 244 (1st Cir. 2015) ("the company did not withhold information about the FDA's concerns" and disclosed that the outcome of its discussions with the FDA was uncertain); *Yan v. ReWalk Robotics*, 973 F.3d 22, 40 (1st Cir. 2020) (no obligation to disclose communications with the FDA concerning a post-market surveillance study where the defendants disclosed that the that FDA ordered the study and the risks associated with that study); *Corban v. Sarepta Therapeutics*, 868 F.3d 31, 40 (1st Cir. 2017) (failure to disclose every communication with the FDA not misleading where the defendants disclosed that the FDA requested additional information and that discussions were ongoing).

had 83.7% VE and thus would have top-of-market efficacy and strong commercial prospects. Investors had no way of knowing that the FDA rejected the data supporting the 83.7% VE and required corrected data that reduced the VE so that mRESVIA would no longer be the most effective vaccine as represented. *See In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 331-33 (S.D.N.Y. 2014) (denying dismissal where defendants misled investors by providing data from "Drug Group" and omitted negative data from "Control Group," and explaining that the allegations "do not involve differing interpretations of disclosed data, but rather data that was not disclosed.").

Finally, pointing investors to Moderna's boilerplate risk language in SEC filings does not insulate their false and misleading statements. First, the risk factors concern risks to FDA approval or possible delays, which are inapplicable to this action. *See* MTD at 8. Further, warning that there *could be delays* because Moderna's products must be approved by the FDA, and there *could be* a change in data and study requirements or that varying interpretations of data "*could delay*, limit or prevent marketing approval" did not warn investors that the FDA had already rejected the 83.7% VE but would approve mRESVIA with a 78.7% VE. At best, these warnings disclosed that the FDA could in the future delay approval of mRESVIA, limit who was eligible to take the drug based on age and risk factors or deny approval outright. Regardless, even if the warnings were applicable, they were inadequate because they warned of a potential risk when the risk had already occurred (*i.e.*, the FDA had already rejected the 83.7% VE because of incorrect data). *See Karth v. Keryx Biopharmaceuticals, Inc.*, 6 F.4th 123, 138 (1st Cir. 2021) (collecting cases and explaining that "[i]f a company is … at the edge of the Grand Canyon [it] must warn investors of an imminent cliff. … [and] must also disclose a relevant risk if that risk had already begun to materialize."); *Gerneth*, 2018 WL 935418, at *4 (warning that "FDA might disagree with the design or conduct of its clinical trials, including disagreement about interpretation of data"

16

inadequate … "when in fact the amended complaint alleges that the FDA had already stated its disagreement …by that time"). Accordingly, the Complaint adequately alleges why Defendants' statements were false and misleading when made.

### 2.    Defendants' VE Representations Are Not Protected Opinions

Defendants' statements are not protected opinions because they are not opinions at all, they are factual assertions. "The Supreme Court has explained that the most significant difference between statements of fact and expressions of opinion is that a statement of fact ("the coffee is hot") expresses certainty about a thing, whereas a statement of opinion ("I think the coffee is hot") does not." *Constr. Ind. & Laborers Joint Pension Tr. v. Carbonite*, 22 F.4th 1, 7 (1st Cir. 2021) (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015)). The VE for mRESVIA is a verifiable, factual calculation based on objective data calculated in accordance with an FDA study protocol.

When determining whether a statement is opinion or fact, the relevant inquiry is whether the language "reasonably would be understood to declare or imply provable assertions of fact." *SEC v. Lemelson*, 532 F. Supp. 3d 30, 43 (D. Mass. 2021) (quoting *Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 727 (1st Cir. 1992) (rejecting argument that because defendant believed statements, they were opinions). None of Defendants' Class Period statements were qualified in any way, nor did they contain any language, that would alert a reasonable investor that the 83.7% VE was merely Defendants' "opinion." On the contrary, Defendants presented the 83.7% VE as an established fact. *See* ¶¶80, 83 (February 15, 2024 and February 22, 2024 slides stating VE was 83.7%); ¶84 (February 22, 2024 statement by Defendant Hoge: "Vaccine efficiency was 83.7% against RSV"); ¶87 (February 23, 2024 annual report to shareholders: "mRA-1345 met primary efficacy endpoints, demonstrating vaccine efficacy of 83.7%"); ¶90 (February 29, 2024

17

slides stating VE as 83.7%);  ¶93 (March 15, 2024 annual report to shareholders: "The trial met both its primary efficacy endpoints with a vaccine efficacy (VE) of 83.7%"); ¶96 (March 27, 2024 statement: "the efficacy values reported are 83.7% . . ."); ¶97 (March 27, 2024 slides stating same); and ¶100 (May 2, 2024 slides stating same). Defendants' factual assertions that mRESVIA's VE was 83.7% are nothing like the opinion statements in the cases cited by Defendants. *See* MTD at 23; *see also Shash v. Biogen, Inc.*, 84 F.4th 1, 11-13 (1st Cir. 2023) ("***I think*** our data are all consistent with that" was an opinion statement); *Brill v. Invivyd, Inc.*, 2024 WL 4228832, at *8 (Dist. Mass. Sept. 18, 2024) ("[E]xpects," "anticipates," "to date," "likely," "yet to come," and "so far up to that point" opinion statements that "convey[] some lack of certainty").

Despite this, Defendants argue that their statements representing that mRESVIA had a VE of 83.7% constitute inactionable opinions because they reflect Defendants' "interpretation" of the ConquerRSV trial data and disagreements over scientific data do not give rise to securities fraud. MTD at 23 (citing *Shash*, 84 F.4th at 17). Defendants' "opinion" defense is meritless because even if the Court were to construe Defendants' statements as opinions, they are still actionable. *Omnicare* provides no license to withhold material information that undermines public statements.

The First Circuit in *Carbonite* explained how opinion statements can mislead investors:  "a statement in the form of an opinion . . . may convey three facts: that the speaker has such a belief; that the belief fairly aligns with the facts known to the speaker; and, if stated in the context of the securities market, that the speaker has made the type of inquiry that a reasonable investor would expect given the circumstances." *Carbonite*, 22 F.4th at 7 (citing *Omnicar*e, 575 U.S. at 188-89). Accepting the Complaints' allegations as true, all three of these facts are false. Defendants knew that the FDA found inconsistencies in the data supporting the 83.7% VE, Defendants submitted the corrected dataset to the FDA showing a 78.7% VE, and Defendants agreed that mRESVIA had

a 78.7% VE using corrected datasets. By failing to disclose this information, Defendants "omitted material information necessary to render [their] statements not misleading." *See Shash*, 84 F.4th at 12 (opinion that "I think our data are all consistent" with needing higher doses misleading under *Carbonite* because defendant knew not *all* of the data was consistent with needing higher dosages).

Defendants' "scientific disagreement" defense also misconstrues the facts because there was no disagreement between Moderna and the FDA concerning the interpretation of the data during the Class Period and the Complaint contains no such allegations. Instead, inconsistencies in the data needed to be corrected. Requiring Moderna to correctly follow the protocol it agreed upon with the FDA does not amount to a "scientific disagreement." *See Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 352 (3d Cir. 2009) ("While it is true that a legitimate disagreement over scientific data does not give rise to a securities fraud claim, plaintiffs alleged something quite different: a bad faith misrepresentation of scientific data).

Further, there are no facts showing Defendants disagreed with the FDA's requirement that Moderna correct the data to include the additional 21 cases that occurred prior to the DCO, or that Moderna refused to correct the data. Instead, Defendant Hoge admitted that "during the process of the review with the FDA," the FDA requested Moderna "to include a set of cases," and "because it added about 20 more cases to that primary analysis, we ultimately agreed with the agency to include those." ¶¶60, 64. This is not a difference of opinion. It is a fact that Moderna agreed to create and submit updated data, and that updated data included additional cases that reduced the VE.[14] Defendants' statements are actionable.

---

[14] Defendants' cited cases are inapposite. MTD at 23. The statements concerning aducanumab's efficacy in *Shash* were deemed not actionable because there were no allegations that the defendants knew or had been warned that there was data undermining their statements. *Shash*, 84 F.4th at 15. The court also found there was a legitimate disagreement over the interpretation of the data in

### B.    The Complaint Adequately Alleges Scienter

The scienter element is satisfied by "show[ing] either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness." *Kader v. Sarepta Therapeutics, Inc.*, 887 F.3d 48, 57 (1st Cir. 2018). "Recklessness in this context requires a highly unreasonable omission constituting ... an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers and sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Carbonite*, 22 F.4th at 8–9.

The PSLRA requires a complaint to plead with particularity facts that give rise to a strong inference of scienter. *Collier v. ModusLink Global Sols*, 9 F. Supp. 3d 61, 69 (D. Mass. 2014). When analyzing scienter, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 310, 326 (2007). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Id*. at 324. "[W]here there are equally strong inferences for and against scienter, *Tellabs* now awards the draw to the Plaintiff." *Collier*, 9 F. Supp. 3d at 69. The court must also "accept well-pleaded factual allegations in the complaint as true and . . . view all reasonable inferences in plaintiff's favor." *Carbonite*, 22 F.4th at 6.

---

*Shash* because the majority of the FDA working group **agreed** with Biogen's interpretation of the data, and only one FDA analyst held a differing view. *Id*. Similarly, there were no allegations in *Brill* that the defendants knew of contrary information when they issued their opinion statements nor any allegations suggesting they did not conduct the inquiry reasonable investors would expect. *Brill*, 2024 WL 4228832, at *8, *9. *See also In re Karyopharm Therapeutics Sec. Litig.*, 552 F. Supp. 3d 77, 87-89 (D. Mass. 2021) (opinion statement not actionable because the plaintiffs did not plausibly allege that the defendants knew when they made their statements that the data contained errors); *Pizzuto v. Homology Meds., Inc.*, 2024 WL 1436025, at *9 (D. Mass. Mar. 31, 2024) (opinion statements inactionable where, unlike here, there were no material facts related to the defendants' knowledge that were omitted).

20

The Complaint alleges a strong inference of scienter showing intent or recklessness through particularized facts from FDA documents and Defendant Hoge's admission that Defendants knew or recklessly disregarded that the FDA rejected the data yielding an 83.7% VE rate and that the corrected data showed the VE was 78.7%. The Complaint bolsters the already strong inference of scienter with allegations showing that Defendants were motivated to make mRESVIA appear to be the most effective vaccine, and how knowledge of these acts were central to the core operations of Moderna. Taken collectively, the allegations demonstrate a cogent and compelling inference of scienter that outweighs, or is at least as strong as, Defendants' claims of being non-culpable.

### 1.    The Complaint Details Defendants' Intentional or Reckless Misconduct Raising a Strong Inference of Scienter

Defendants acted with scienter while intentionally (or at least recklessly) issuing the actionable misstatements that knowingly misrepresented and omitted material facts. *Carbonite*, 22 F.4th at 9. Citing now-public FDA records, the Complaint alleges that the FDA required Moderna to correct its primary analysis. Moderna complied by revising and providing the FDA with corrected datasets. The corrected dataset for the November 30, 2022 DCO rightly included 21 additional positive cases of RSV that met the study definition and reduced the VE to 78.7%. The creation and submission of the corrected datasets demonstrate Defendants' knowledge that their later statements representing the VE was 83.7% for the primary analysis were false and misleading when made. ¶64. While "smoking gun" evidence is not required, the BLA Review Memo and Summary Basis provide powerful indicia that Defendants intentionally misled investors during the Class Period. At the very least, those documents show Defendants acted highly recklessly and disregarded the danger that investors would be misled when Defendants omitted that the FDA and Moderna agreed that mRESVIA had a 78.7% VE using corrected data. *See Aldridge*, 284 F.3d at 83; *Shash*, 84 F.4th at 14 ("investors sufficiently alleged facts from which we can infer that

Defendants were aware of the contradictory subgroup data and that their failure to disclose said data was a highly unreasonable omission, giving rise to a strong inference of scienter").

Defendants offer an erroneous counternarrative that they believed the pre-Class Period 83.7% VE was still correct and that the FDA did not "reject" the earlier dataset. This argument is wrong and barred because it contradicts the FDA's official records, is not based on any fact in the Complaint, and is not otherwise available as a judicially noticeable fact. *See Tellabs*, 551 U.S. at 324 (creating an opposing inference is tied to "the facts alleged"). As the BLA Review Memo states, the FDA required corrected datasets, which had additional cases that were required to be included in the primary analysis. Those 21 extra cases decreased the VE for the primary analysis significantly (there were only 85 total in the study). *See supra* 6-7 (noting the 67% increase in mRESVIA group cases). It is implausible that the FDA, after identifying Moderna's erroneous data, would ignore a 67% increase in positive cases and approve mRESVIA's label and marketing materials for public consumption with a VE it knew was inflated and based on wrong data.

Defendants also stretch the imagination by claiming maybe the FDA was entertaining two datasets (one correct and one incorrect) for the primary analysis VE. This speculative argument is also out-of-bounds. It is inconsistent with the BLA Review Memo, Summary Basis, the Complaint, and public records. Only one primary analysis VE figure is on the mRESVIA FDA approved label: 78.7%. There is no mention of the wrong and inflated 83.7% VE because that VE was determined to be wrong by February 2024.[15] *See Aldridge*, 284 F.3d at 79 (cautioning courts on a motion to dismiss not to "draw[] inferences in the defendant's favor") (cleaned up); *Rosen v. Textron Inc.*,

---

[15] Defendants' attempt to claim the 83.7% VE is still valid (MTD at 29), is further belied by Hoge's admission using the past tense to describe that the primary analysis VE "*had been* 83.7%."

321 F. Supp. 2d 308, 324-25 (D.R.I. 2004) (noting that when plaintiff's interpretation was "at least as plausible" as defendants', "[i]t would be improper ….to prefer the Defendants' explanation").

Defendants next argue that a "scientific disagreement … cannot plead scienter" (MTD at 29), but this argument again misconstrues the facts. The facts alleged in the Complaint make clear that there was no disagreement between Moderna and the FDA—in fact, there was "agree[ment]." ¶57. Defendant Hoge admitted "we ultimately agreed with the [FDA]" and corrected the primary analysis. This is not a difference of opinion. It is a fact that Moderna agreed to create and submit updated data, and that updated data was corrected to include additional cases that reduced the VE. *See Alaska Elec.*, 554 F.3d at 352 ("While it is true that a legitimate disagreement over scientific data does not give rise to a securities fraud claim, plaintiffs alleged something quite different: a bad faith misrepresentation of scientific data. Those allegations are sufficient to … give rise to a strong inference of scienter."); *Shash*, 84 F.4th at 14 (statement referring to "all data" "does not amount to a legitimate disagreement over scientific data" because, like here, "that statement is necessarily discredited by [Defendants'] knowledge [of conflicting data]").[16] Likewise, *Vertex's* scientific dispute is inapposite because there defendants "cautioned that 'complete data' were not yet available" *Loc. No. 8 IBEW Ret. Plan & Trust v. Vertex Pharm., Inc.*, 838 F.3d 76, 78, 81-82 (1st Cir. 2016). That did not happen here. The Defendants were not transparent about the FDA requiring a corrected dataset and the import of the corrected data on VE.

---

[16] *See supra* n. 14 (explaining that the court found a legitimate disagreement over scientific data in large part because the majority of the FDA working group agreed with the defendants' interpretation of the data and only one FDA analysis held a differing view). Defendants' other cases are similarly inapposite. In *Paice*, "the facts supporting plaintiffs' theory of fraud were publicly disclosed." *Paice v. Aldeyra Therapeutics*, 2025 WL 815065, at *8 (D. Mass. Mar. 14, 2025); *Leung v. bluebird bio, Inc.*, 599 F. Supp. 3d 49, 63 (D. Mass. 2022) (no facts that the FDA was highly likely to reject submission). Here, the fact that the FDA had already rejected the earlier submission is well-pled and was not publicly disclosed until after the Class Period.

23

Defendants also claim they were only engaged in immaterial, regulatory back-and-forth with the FDA's "interim request," the non-disclosure of which is insufficient for scienter. MTD at 30. This argument fails because: 1) the non-disclosure of the FDA's request adequately demonstrates scienter because the primary analysis VE (*i.e.*, how well the product works) was a critical result of the FDA approval process; and 2) Defendants did not warn investors there was any dispute with the FDA.[17] *Compare id.* (citing *Corban*, 868 F.3d at 40 (no requirement to disclose FDA communications about "intricate and technical" factors); *ReWalk*, 973 F.3d at 40 (no requirement to disclose "run-of-the mill regulatory back-and-forths"); *Kader*, 887 F.3d at 59 (company disclosed some FDA concerns) and *Fire & Police Pension Ass'n of Col. v. Abiomed,* 778 F.3d 228, 243 (1st Cir. 2015) (Abiomed told investors that "the outcome of its regulatory back-and-forth with the FDA was uncertain.")), *with supra* 6-7, 11, 14-16; *Sanders v. AVEO Pharm., Inc.*, 2015 WL 1276824, at *8 (D. Mass. Mar. 20, 2015) ("The Court agrees with other district courts that a failure to disclose FDA's serious criticism is a material omission."); *Transkaryotic*, 319 F. Supp. 2d at 161  ("the failure to disclose FDA's serious criticism is a material omission, particularly in light of the company's race [] for FDA approval as well as the emphasis … on what its clinical trials revealed about the efficacy"); *In re Biogen Sec. Litig.*, 179 F.R.D. 25, 36 (D. Mass. 1997) (finding a jury could infer scienter when defendant made positive statements without disclosing FDA's concerns).

Furthermore, there is no timing problem as to when the adverse information was known to Defendants concerning the inflated VE. Defendants wrongly claim that there are no facts alleged

---

[17] Defendants similarly claim that Moderna was "transparent" about how the 83.7% VE figure was reached but they omitted that corrected data now had 85 cases and thus no longer supported the 83.7% VE. *See supra* 6-7, 11; *see also Charles River*, 152 F.4th at 13 ("assuming the allegations of the complaint are true, scienter flows inexorably from our conclusions that" defendants' statements omitted key information).

that the "FDA reached and conveyed its decision to Moderna." MTD at 30. The Complaint alleges, however, that based on the BLA Review Memo and Summary Basis, that the FDA determined the original datasets were not viable as of January 25, 2024 "due to inconsistencies" with them (¶60) and requested corrected datasets from Moderna (¶¶56, 58), that Moderna complied with this request and created corrected datasets on February 13, 2024, and that these corrected datasets "identified additional RSV cases with onset prior to the DCO which met the study case definition" (*Id.*), and Moderna submitted the corrected datasets to the FDA on February 26, 2024. ¶60.[18] Defendants then repeatedly misled investors after knowing the FDA rejected, and Moderna replaced, the data supporting the inflated 83.7% VE. *See Carbonite*, 22 F.4th at 11 (Defendants' "flat-out claims about the product as it then stood" support an inference of scienter).

Defendants' three remaining scienter arguments are also unavailing. MTD at 30-31. First, Defendants cannot avoid liability relying on warnings that the FDA may delay or deny approval if it viewed clinical trial data differently or "require[s] additional data or analyses." MTD at 30. These "warnings" at most refer entirely to as-yet-unrealized risks unrelated to this case, and nothing alerts the market that Moderna had already submitted an entirely new corrected dataset to the FDA with additional positive cases of RSV.[19] *See supra* 16 (explaining that Moderna's warnings did not warn investors that the FDA rejected the 83.7% VE). "Telling investors of a

---

[18] Defendants' cited cases are inapplicable to the allegations here. In *Corban*, unlike here, the FDA accepted the data stating it "was open to considering an NDA based on these data" months **before** the alleged misstatement referencing the data. 868 F.3d at 39. In *Leavitt*, unlike here, there were no allegations that the FDA "expressed to defendants its disapproval of [the] data." *Leavitt v. Alnylam Pharms., Inc.*, 525 F. Supp. 3d 259, 265-67 (D. Mass. 2021). In *Kader*, the defendants were not "unequivocally told [by the FDA] that further data would be required." *Kader v. Sarepta Therapeutics, Inc.*, 2017 WL 72396, at *7 (D. Mass. 2017), *aff'd*, 887 F.3d 48 (1st Cir. 2018); *ReWalk*, 973 F.3d at 40 (same).

[19] Defendants' cited authorities involve "informative disclosures" and are inapposite on these facts where Defendants merely warn of hypothetical risks that had already occurred. MTD at 30, n. 33.

25

possible risk faced by the industry" does not give Moderna "a free pass to deceive investors about a specific risk faced by [Moderna] itself." *Charles River*, 152 F.4th at 13. *See also Brennan v. Zafgen, Inc.*, 199 F. Supp. 3d 444, 463 (D. Mass. 2016) ("Having started down the road of disclosure, defendants cannot use the company's earlier wholesale disclaimer … as a blanket shield."), *aff'd*, 853 F.3d 606 (1st Cir. 2017). Second, contrary to Defendants' suggestion (MTD at 31), Moderna did not promptly disclose the corrected VE known in February.[20] Third, Defendants' argument that the VE difference was immaterial is factually incorrect. The difference is highly material because it signified whether mRESVIA had been sufficiently differentiated and thus indicative of whether it was commercially viable. ¶¶111-119. Investors recognized as much be devaluing the stock price. Regardless, the First Circuit has found that materiality is not ripe for review under a Rule 12(b)(6) motion unless there is no plausible question of fact regarding whether the omission is material. *See Cabletron*, 311 F.3d at 34.

Accordingly, the BLA Review Memo, Summary Basis, and Hoge's admission create a strong inference that Defendants knew or recklessly disregarded that the 83.7% VE touted during the Class Period was false and misleading to investors, which is not overpowered by Defendants' claims of innocence.

### 2.    Defendants Were Motivated to Conceal the Lower VE

Scienter may be established by combining various facts and circumstances indicating fraudulent intent, including "motive and opportunity." *Aldridge,* 284 F.3d at 82. While Plaintiff is not required to allege motive, "[a] strong inference of scienter is buttressed [by] allegations of

---

[20] Defendants' cases (MTD at 31, n. 34) are inapposite. *See supra* 23-24 (comparing cases discussing requirements of disclosure of FDA concerns); *see also In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 42 (1st Cir. 2014) (company did not disclose FDA letter that was merely "observational in nature"); *Paice*, 2025 WL 815065, at *10 (company disclosed content of FDA meetings, stating it was "aligned with the FDA").

motive and concealment." *Republic Maximal LLC v. Romulus Capital Partners II, LLC*, 2024 WL 3169798, at \*15 (D. Mass. 2024), *adhered to by* 2024 WL 3834940 (D. Mass. Aug. 15, 2024). Here, Plaintiff's allegations of three intertwined motives: motive to differentiate mRESVIA as superior to the competition such that it would be commercially viable, motive to replace waning Spikevax revenue and validate the Company's thesis as a platform Company, and motive to avoid a weak bargaining position, reinforce the already strong inference of scienter.

Defendants were motivated to keep up the appearance that the Company had the most effective RSV vaccine because of the multi-billion-dollar opportunity that mRESVIA represented. ¶¶111-117. Indeed, at the start of the Class Period, Moderna had developed just one FDA-approved product (Spikevax) and had not filed for FDA approval of any product candidates other than mRESVIA. *Id.* With Spikevax revenues dramatically reducing and creating a gaping $10 billion hole in Moderna's revenues in need of replacement, Defendants needed mRESVIA to be commercially successful and capture a significant piece of the multi-billion-dollar market. ¶40. Especially since no other product in Moderna's pipeline was as close to FDA approval as mRESVIA, meaning years of the Company's financial success were dependent on mRESVIA. ¶40. Capturing significant market share requires being first to market or having a product that is substantially differentiated from the products already in the market. ¶115. Defendants could not meaningfully engage in discussion with potential buyers when the buyers already have a more effective product in hand. ¶118.

Unable to meaningfully contest the well-pled scienter allegations, Defendants attempt to poke holes in the individual facts alleged that establish Defendants were motivated by the distinct need to differentiate mRESVIA from the earlier market entrants. Defendants contend these

27

allegations are "generic," but the motive allegations here are unique to Moderna and each of

Defendants' purported "defects" (MTD at 26), fails because:

- The fact that at 78.7% VE, mRESVIA was not the least effective RSV vaccine, instead it was the second least effective RSV vaccine, out of three, does not defeat motive. As a late market entrant, to differentiate mRESVIA it needed to be a superior product. ¶111. The McKinsey Study shows the difference between being second or third, is *de minimis* relative to the difference between being first or second. ¶39.

- The fact that an analyst found difficulty comparing VE across different products only bolsters Defendants' motive to frame mRESVIA as having top-of-market efficacy because with comparison limitations, the bottom-line VE number takes on heightened importance.

- While some analysts remarked about potentially differentiating mRESVIA in ways other than its VE, a product's add-on features are insignificant relative to how well it actually works, *i.e.,* its VE.

- Defendants argue that the ACIP parity decision rendered the differences between the vaccines' VEs irrelevant. But the ACIP decision came out on August 15, 2024, and Defendants had no way of knowing this would be the outcome when concealing the 78.7% VE during the Class Period.

- The first mover advantage is not speculative. Defendants' attempt to cherry-pick quotes from the studies cited in the Complaint fails because they cannot dispute this well-established market dynamic supported by the studies cited in the Complaint.

Defendants also point out the Complaint does not allege that mRESVIA would not obtain

FDA approval at 78.7% VE. *Id.* This does not affect the motive alleged. The Complaint alleges

motivating factors relating to mRESVIA's commercial success. Alleging the "very survival" of

Moderna was at risk is not the standard for showing motive, courts routinely find motive

adequately alleged without allegations of the company being financially on the ropes.[21] *See, e.g.,*

*Collier*, 9 F. Supp. 3d at 74; *Charles River*, 152 F.4th at 13; *Carbonite*, 22 F.4th at 9.

---

[21] Indeed, none of the cases cited by Defendants involve factual allegations comparable to this case, as detailed *supra* 26-27. *Corban*, 868 F.3d at 41 (generic motive to improve financial results); *Celano v. Fulcrum Therapeutics, Inc.*, 2025 WL 928783, at *19 (D. Mass. Mar. 27, 2025) (weak insider trading allegations; motive to sell "very small fraction" of stock); *Brennan v. Zafgen*, 853 F.3d 606, 616 (1st Cir. 2017) (same); *Kader*, 887 F.3d at 60 (allegations that "was dependent upon

Defendants also attempt to analogize the allegations that Defendants were motivated to avoid weakening bargaining power with a motive to raise capital, secure investments, or negotiate debt, to frame it as too generic. MTD at 27. But the motive to conceal that the Company was introducing an inferior product to an established market and thus would fail to capture adequate market share is highly specific to Moderna and these facts are nothing like the generic motive to present an optimistic view of financials to secure investment.[22] Likewise, Defendants do not meaningfully dispute that the UCLA Paper cited in the Complaint supports these allegations of motive, only pointing out that it was based on trials that predated the ConquerRSV Trial. MTD at 28. The study is far from outdated as it was published in 2024, and its relevance is that it is predictive of RSV vaccine market dynamics. Defendants also argue that there are no facts that buyers weighed efficacy more than other factors such as ease of administration, storage, or price. MTD at 27. That is speculation and whether buyers would care more about vaccine efficacy should be resolved in Plaintiff's favor prior to discovery.

Finally, the absence of insider stock sale allegations does not negate Defendants' motive or a strong inference of scienter. *Compare* MTD at 25, *with Tellabs*, 551 U.S. at 325 (lack of insider sales is not fatal to scienter). Indeed, the lack of significant sales here is consistent with concealing a fraud because it is "reasonable to refrain from selling stock during the Class Period

---

offerings to fund its operations"); *Pizzuto*, 2024 WL 1436025, at *18 (generic motive to raise capital); *In re Bos. Sci. Sec. Litig.*, 646 F. Supp. 3d 249, 287-88 (D. Mass. 2022) (same); *Battle Constr. v. InVivo Therapeutics Holdings*, 101 F. Supp. 3d 135, 141 n.6 (D. Mass. 2015) (same), *aff'd sub nom. Ganem v. InVivo Therapeutics Holdings Corp.*, 845 F.3d 447 (1st Cir. 2017); *Whitehead v. Inotek Pharms.*, 2018 WL 4732774, at *5 (D. Mass. June 27, 2018) (same); *Angelos v. Tokai Pharms.*, 494 F. Supp. 3d. 39, 59 (D. Mass. 2020) (same).

[22] Defendants case citations on this point are thus inapposite because their analogy fails and none of those cases dealt with the motive to avoid a weak bargaining position as alleged here. *See supra* n. 21

to avoid the appearance of wrongdoing." *Collier*, 9 F. Supp. 3d at 74. Thus, the absence of significant stock sales does not undercut an otherwise well-supported strong inference of scienter.

### 3.   Core Operations Doctrine Supports Scienter

Scienter is imputed to individual defendants where "[f]acts critical to a business's core operations … are so apparent that their knowledge may be attributed to the company and its officers." *Crowell v. Ionics, Inc*., 343 F. Supp. 2d 1, 19 (D. Mass. 2004). A product's "position as the core product tips towards a finding for a strong inference of scienter [even] in the absence of further allegations of Defendants' intent or recklessness or any plus factor." *In re iRobot Corp. Sec. Litig.*, 527 F. Supp. 3d 124, 141 (D. Mass. 2021).

Defendants repeatedly highlighted the importance of mRESVIA to the Company, going so far to explicitly refer to RSV vaccines as the new "core underlying business." ¶¶31, 109. This alone establishes that mRESVIA was Moderna's core operations. As the Complaint alleges, mRESVIA had the critical role as the Company's most clinically advanced product candidate and would be relied on to fill the $10 billion revenue void created by dwindling Spikevax demand. *See supra* 4-5, 26-27. Additionally, Defendants routinely stressed the significance of mRESVIA by paying close attention to its progress as a product candidate, advising investors they were monitoring its status in the FDA approval process, and regularly discussing as much on conference calls with investors. ¶¶106-109.

Defendants contend that the core operations doctrine does not support scienter because Moderna had other product candidates in its pipeline for future FDA consideration. MTD at 32. This argument fails because the existence of less-clinically-advanced product candidates in Moderna's pipeline did not negate the importance of mRESVIA during the Class Period. *See Carbonite*, 22 F.4th at 9 (rejecting argument that company did not consider product critical because

30

"it was one of [company's] many offerings"). Indeed, the Complaint alleges, and Defendants do not dispute, that mRESVIA was the most clinically advanced product candidate throughout the entirety of the Class Period (¶111), and the first product which Moderna filed for FDA approval with, since Spikevax years prior. *See supra* 4-5, 26-27.

Moreover, in contrast to *Premca Extra Income Fund LP v. iRobot Corp.*, 763 F. Supp. 3d 121, 159 (D. Mass. 2025), *appeal filed*, 25-1192 (1st Cir. Feb. 25, 2025), and Defendants' other cited authorities, (MTD at 32, n. 38, 39), here Defendants represented that mRESVIA was a product that will be Moderna's core underlying business. Additionally, the Complaint alleges facts that are more specific than a claim Defendants must have known based on their positions at the Company. Plaintiff has alleged "plus factors" showing Defendants monitored the FDA approval process and even Defendant Hoge admitted that "we" agreed with the FDA regarding mRESVIA's 78.7% VE.[23] ¶¶108-110. Accordingly, mRESVIA was critical to Moderna's core operations, which supports a strong inference of Defendants' scienter.

### 4. A Holistic Evaluation of the Allegations Confirm That the Inference of Scienter Is Stronger than a Competing Non-Culpable Inference

"[A]ssuming the allegations of the complaint are true, scienter flows inexorably" from the conclusion that Moderna told its investors that the VE was 83.7% when it knew the FDA had rejected the data supporting that figure and the primary analysis VE was 78.7% because Moderna and the FDA agreed that additional positive cases of RSV should be included in the VE. *Charles River*, 152 F.4th at 13. The Complaint alleges scienter inferences that are far more compelling, or

---

[23] Defendants' positions in the Company and the fact that they regularly spoke about monitoring the Trial, and status of the submission to the FDA, supports a finding of scienter. *See Dahhan v. OvaScience, Inc.*, 321 F. Supp. 3d 247, 255 (D. Mass. 2018) (knowledge of underlying data contradicting public statements); *Transkaryotic*, 319 F. Supp. 2d at 162 ("that…defendants published statements when they knew facts suggesting the statements were… misleadingly incomplete is…evidence of scienter").

at the very least equal to, Defendants' manufactured nonculpable inferences of innocence. The

Complaint sufficiently alleges facts supporting the following inferences of scienter:

- On January 25, 2024, the FDA notified Defendants that due to inconsistencies in the data used the support the 83.7% VE, the FDA rejected the original primary analysis data and required Moderna to submit corrected replacement datasets to be used going forward.

- On February 13, 2024, Defendants corrected miscategorized cases and erroneous data by creating a replacement dataset for the primary analysis. The corrected dataset identified 21 additional positive RSV cases that met the study case definition and occurred before the November 30, 2022 DCO but were omitted from earlier VE calculations. This increased the prior case count to 85 from 64 and equated to a 78.7% VE.

- On February 26, 2024, Defendants agreed to submit the corrected datasets to the FDA for mRESVIA's BLA, which the FDA previously advised were to replace the earlier datasets.

- The FDA's record of the approval process in the BLA Review Memo has no record that it or Moderna continued to consider the inflated and wrong 83.7% VE during the Class Period. Conversely, it states that it required corrected datasets for the same DCO, which identified 21 additional cases and corrected the VE to 78.7%.

- On May 31, 2024, the FDA approved mRESVIA with a primary analysis VE of 78.7% with no mention of the earlier 83.7% VE because that was rejected in February.

- A reasonable interpretation of Hoge's admission is that while the primary analysis "had been" 83.7% prior to the Class Period when the NEJM looked at the wrong data in 2023, Defendants agreed with the FDA in February 2024 that the corrected datasets should be used showing the VE was 78.7%.

- Defendants had a strong motive to conceal the lower VE during the Class Period because as a late market entrant, mRESVIA needed to remain the top-of-market VE to reserve market share for obtaining contracts to sell mRESVIA for the flu season and to validate the Company's thesis of being a platform company.

- Defendants knew the primary analysis of 83.7% was false and misleading because mRESVIA accounted for a central role within the Company.

Defendants' competing non-culpable inference essentially does not exist. Defendants

largely rely on documents outside the Complaint, incapable of being authenticated, and/or are

subject to the PSLRA's stay of discovery. Inferences based on those documents have no weight.

Perhaps even worse is that the improper exhibits fail to support non-culpable inferences. For

example, Defendants claim that the FDA did not reject the dataset in January 2024 based on

32

Exhibit 20. That writing states that the primary analysis data needed to be "replaced" and the "revisions to the datasets should be implemented in all future dataset submissions." Def. Ex. 20, Doc. No. 72-20. The writing at Exhibit 21 confirms Defendants knew the primary analysis had a "78.7% VE" on February 26, 2024. *See* Def. Ex. 21, Doc. No. 72-21 at 14, 16. Exhibit 22 seems to be an exercise in futility—a memo complaining that the FDA was creating a *post-hoc* analysis and confirming Defendants' scienter. *See* Def. Ex. 22, Doc. No 72-22. Not even at summary judgment would these exhibits absolve Defendants. Defendants' jury argument that they are not culpable because they believed that the FDA conducted an improper *post-hoc* analysis or was considering the wrong data are not supported by any FDA document or judicially noticeable fact. Discovery will likely show that while Moderna may not like being regulated by the FDA, it corrected the dataset in February 2024 and knew (or recklessly disregarded) that the FDA would only accept correct data for mRESVIA's label. In sum, the inference of scienter is stronger, or at least equal to, any inference of innocence.

### C.    Plaintiff Alleges Loss Causation

"To survive a Rule 12(b)(6) motion as to loss causation, a plaintiff must provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Shash*, 84 F.4th at 19. "That is often shown by a corrective disclosure of previously withheld information followed by a decrease in stock price (so long as other possible explanations are eliminated)." *Shih v. Amylyx Pharms., Inc.*, 2025 WL 2807756, at *4 (D. Mass. Sept. 30, 2025). Loss causation "is a factual issue more suited to summary judgment." *In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 50 (D. Mass. 2006)*; Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*, 775 F. Supp. 2d 227, 244 (D. Mass. 2011) ("The PSLRA imposes "ordinary"—not heightened—pleading requirements for loss causation."). Indeed, pleading loss causation "should not prove burdensome." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

Plaintiff easily meets this standard. The Complaint adequately alleges Defendants' misleading statements and omissions concealed from the market that mRESVIA had a lower VE based on the datasets provided to the FDA, and that the FDA did not accept Moderna's datasets establishing an 83.7% VE. ¶122. The Complaint further alleges that Defendants' misstatements were corrected by the disclosure on May 31, 2024 that revealed the VE approved by the FDA was only 78.7%. ¶123. The revelation of this news caused Moderna's share price to drop by a material amount. ¶¶124-125. *See Shih*, 2025 WL 2807756, at *4-5 (allegations of a corrective disclosure associated with a drop in share price shows loss causation); *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 256 (D. Mass. 2006) (allegations of false statements, corrective disclosure, and share price drop sufficient to plead loss causation).

Defendants argue that the corrective disclosure did not correct the earlier statements because they claim there was no fraud to cause a loss. MTD at 34. As discussed *supra* 11-16, Defendants' arguments fail, thus, their loss causation argument fails as well. Indeed, all of Defendants' cited authority on this point are inapplicable because those cases involved instances where courts found there were no misleading statements. *See* MTD at 34-35. Additionally, Defendants ignore that the corrective disclosure explicitly revealed to investors for the first time that the FDA refused to accept Moderna's inflated VE figure for mRESVIA. Accordingly, the May 31, 2024 press release corrected and cured the false and misleading 83.7% VE statements. ¶¶74-76, 120-125. Because Defendants intentionally or recklessly misled investors about mRESVIA's VE, the revelation of the true VE caused the economic losses to investors.

### D.    Plaintiff Alleges Scheme Liability

Plaintiff adequately alleges a scheme liability. ¶¶137-146. "[S]ubsection (a) of the Rule [10b-5] makes it unlawful to 'employ any device, scheme, or artifice to defraud.' …And subsection (c) makes it unlawful to 'engage in any act, practice, or course of business' that 'operates ... as a

fraud or deceit.'" *Lorenzo v. SEC*, 587 U.S. 71, 77 (2019). A fraudulent scheme under Rule 10b-5(c) is "expansive" and "capture[s] a wide range of conduct." *Id.*

The Complaint alleges that Defendants participated concealed from investors that the FDA and Defendants had identified deficiencies with the datasets supporting the 83.7% VE and knew the correct VE was 78.7%. Defendants concealed these facts to maintain their top-ranking VE status and leveraging that false perception. *See supra* 6-7, 11, 30-31. While carrying out this scheme, Defendants made misrepresentations to investors with scienter that inflated the price of Moderna's securities. *Id.* This course of conduct is sufficient to allege scheme liability. *See SEC v. Sharp*, 626 F. Supp. 3d 345, 390 (D. Mass. 2022) ("Conduct itself can be deceptive" under Rule 10b-5); *SEC v. Liberty*, 2021 WL 664834, at *4 (D. Me. Feb. 19, 2021) (finding scheme liability when defendant acted with scienter).

## V.    CONCLUSION

For the foregoing reasons, the Court should deny the Motion in its entirety. [24]

DATED: December 8, 2025

> Respectfully submitted,
>
> **HUTCHINGS BARSAMIAN
> MANDELCORN, LLP**
> /s/ *Theodore M. Hess-Mahan*
> Theodore M. Hess-Mahan (BBO #557109)
> 110 Cedar Street, Suite 250
> Wellesley Hills, MA 02481
> Telephone: (781) 431-2231
> Facsimile: (781) 431-8726
> thess-mahan@hutchingsbarsamian.com
>
> *Local Counsel for Plaintiff and the
> Proposed Class*

---

[24] Because Plaintiff states a 10(b) claim, the 20(a) claim stands. *Collier*, 9 F. Supp. 3d at 76-77. If the Court grants any part of the Motion, Plaintiff respectfully requests leave to amend.

**BERNSTEIN LIEBHARD LLP**
Stanley D. Berstein (*pro hac vice*)
Michael S. Bigin (*pro hac vice*)
Stephanie M. Beige *(pro hac vice)*
Jeffrey R. McEachern (*pro hac vice* motion forthcoming)
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218
bernstein@bernlieb.com
bigin@bernlieb.com
beige@bernlieb.com
jmceachern@bernlieb.com

*Lead Counsel for Plaintiff and the Proposed Class*

36

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was filed with the Court's electronic case filing (ECF) system on December 8, 2025, which caused an electronic copy of this document to be served on all counsel of record in this matter who have registered for ECF service.

/s/ *Theodore M. Hess-Mahan*
Theodore M. Hess-Mahan