UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MASON WENTZ, Individually and On Behalf of All Others Similarly Situated,

*Plaintiff,*

v.

MODERNA, INC., STÉPHANE BANCEL, JAMES M. MOCK, and STEPHEN HOGE,

*Defendants.*

No. 24-cv-12058-IT

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

LEVENSON, U.S.M.J.

INTRODUCTION

This putative federal securities class action lawsuit is based on alleged violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

In the Amended Class Action Complaint (Docket No. 62) ("Complaint"), Plaintiff alleges that Defendants Moderna, Inc. ("Moderna"), as well as Stéphane Bancel, James M. Mock, and Stephen Hoge (collectively, "Individual Defendants") misled investors about clinical trial data measuring the efficacy of Moderna's RSV vaccine, mRESVIA.

Moderna's original tabulation of data from its studies of the vaccine showed an efficacy rate of 83.7%. In January of 2024, the U.S. Food and Drug Administration ("FDA"), during its review of Moderna's application for approval of the vaccine, requested updated data from Moderna. That updated data pointed to an efficacy rate of 78.7%. This difference of about 5% didn't affect the FDA's approval of the vaccine; the FDA's approval was announced on May 31, 2024. Plaintiff contends, however, that Moderna knew, from the time it assembled the updated

data, that the lower efficacy number was the correct one. Plaintiff alleges that Moderna defrauded investors by repeatedly citing the higher figure in public statements between February 15 and May 31, 2024 (the "Class Period"). Plaintiff alleges that Defendants' misstatements about the efficacy figure artificially inflated the market value of Moderna's stock, and that Moderna's stock price fell when the FDA used the lower efficacy figure in its approval of the vaccine.

Pending before the court is Defendants' Motion to Dismiss the Complaint (Docket No. 71).

For their part, Defendants dispute that there was anything inaccurate or misleading about Moderna's use of the original efficacy figure and contend that the decision to include additional data in the efficacy calculation reflects a mere difference of opinion about methodology.

This report will focus on two elements of Plaintiff's claims: misrepresentation or omission, and scienter.

First, I will address Plaintiff's allegation that Moderna's continued use of the 83.7% efficacy figure, on February 15, 2024, and in the following months, constituted a misrepresentation or fraudulent omission. At the motion to dismiss stage, the Court doesn't decide whether Plaintiff can prove his case; it considers only whether Plaintiff states a plausible claim for relief if we assume all his factual assertions are true. As discussed below, Plaintiff has plausibly alleged: (1) that the lower 78.7% efficacy figure could readily have been calculated once the updated data was assembled during the FDA review process (*i.e.*, as of February 13, 2024); and (2) that continuing to repeat the higher efficacy figure after that date amounted to either a misrepresentation of fact, or a misleading omission or half-truth (based on failure to mention the lower efficacy figure in public statements during the Class Period).

Second, I address Plaintiff's allegation that Defendants acted with scienter, that is, with an intent to deceive investors. The Court must consider this allegation in light of the pleading standards established by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). The PSLRA permits private securities fraud cases to go forward only if a complaint presents a strong inference of scienter. The factual allegations in this case fall well short of that bar. The Complaint does not suggest any good reason to suppose that Defendants believed the higher figure was incorrect, or that Defendants intended to mislead investors. By Plaintiff's own account, Defendants knew the FDA would publicly disclose whatever efficacy figure the FDA considered most appropriate when it announced the approval of the vaccine. There's nothing in the Complaint to suggest that Defendants stood to gain anything by using the higher number for two and a half months, particularly if they had anticipated that a lower number would be announced upon approval.

On the facts that Plaintiff alleges, the more compelling inference is Defendants' version: that Moderna provided additional data as requested by the FDA during review, that Moderna continued to believe its original efficacy computation was defensible, and that Moderna had no intent to mislead investors. Thus, the Complaint fails to support a strong inference of scienter, as required to meet the pleading standards of the PSLRA.

Accordingly, I recommend that the Court allow Defendants' Motion to Dismiss.

## I. Background

The facts presented below and discussed throughout this report are drawn from the Complaint as well as from Exhibits 2, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, and 16 to the Declaration

(Docket No. 72) submitted in support of Defendants' Motion to Dismiss, along with Exhibits 1 and 2 to the Declaration (Docket No. 74) submitted in support of Plaintiff's Opposition.[1]

### *A. Moderna and the Individual Defendants*

Moderna is a biotechnology company that, among other things, develops messenger RNA ("mRNA") therapeutics and vaccines for the treatment of respiratory viruses. Complaint ¶¶ 3, 24. The Individual Defendants held management positions at Moderna during the Class Period: At all times relevant to this litigation, Bancel has been Moderna's Chief Executive Officer and served on Moderna's Board of Directors, Mock has been Moderna's Chief Financial Officer, and Hoge has been Moderna's President. *Id.* ¶¶ 20–22.

Moderna brought its first commercial product, its COVID-19 vaccine, Spikevax, to market in 2020. *Id.* ¶ 25. Because Spikevax was Moderna's principal source of revenue prior to the Class Period, Moderna's revenue decreased as the COVID-19 pandemic became less of a public health concern. *Id.* ¶¶ 26–27. Faced with this contraction of its revenue stream, Moderna sought to position itself "as a platform company with multiple FDA approved product offerings" beyond Spikevax to increase its revenues again. *Id.* ¶ 29. In investor communications in the years leading up to the Class Period, both Bancel and Hoge emphasized Moderna's focus on expanding its offerings beyond Spikevax. *Id.* ¶¶ 31, 33–34.

---

[1] These documents were not subject to the Plaintiff's Motion to Strike (Docket No. 76) and are deemed to be incorporated into the Complaint. Where a "complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998) (citing *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1015 (1st Cir. 1988)).

### *B. RSV*

Respiratory Syncytial Virus ("RSV") is a respiratory virus that infects the nose, throat, and lungs. *Id.* ¶ 30. While RSV does not usually cause severe illness in healthy people, it can lead to hospitalization for infants, older adults, or those with risk factors. *Id*. RSV ranks among the most common causes of respiratory disease in young children and older adults. *Id.*

### *C. mRESVIA*

Moderna's RSV vaccine, mRESVIA, was its second commercial product. *Id.* ¶ 35. The Phase 3 clinical trial for mRESVIA, commonly referred to as its "ConquerRSV Trial,"[2] was a randomized, double-blind, placebo-controlled study to evaluate both safety and efficacy. *Id.* ¶ 43; Docket No. 72-2 at 2. On January 17, 2023, Moderna reported out that the ConquerRSV Trial showed vaccine efficacy of 83.7% against RSV with two symptoms. Complaint ¶ 47; Docket No. 72-2 at 2. The January 17, 2023, press release, which predates the Class Period by more than a year, was Moderna's first public statement reporting vaccine efficacy of 83.7%. *See* Complaint ¶ 47. Plaintiff cites, in support of Plaintiff's theory of materiality, several contemporaneous analyst reports that commented favorably on the reported efficacy data at that time. *See id.* ¶ 48.

### *D. FDA Approval Process*

Moderna submitted a completed Biologics License Application ("BLA") to the FDA in fall 2023, submitting study results with a data cutoff date of November 30, 2022. *Id.* ¶ 53. The Complaint alleges that on January 25, 2024, the FDA requested "corrected data for the ConquerRSV Trial." *Id.* ¶¶ 56, 58. Plaintiff has fought assiduously to keep out of the record the

---

[2] The full study title is: "A Study to Evaluate the Safety and Efficacy of mRNA-1345 Vaccine Targeting Respiratory Syncytial Virus (RSV) in Adults ≥60 Years of Age." Complaint ¶ 43.

actual communication from the FDA.[3] At oral argument, however, counsel for Plaintiff acknowledged that "corrected" is Plaintiff's own characterization and is not drawn from the FDA's words. *See* Docket No. 91 at 33:21–34:23. In its own words, the FDA merely requested "updated datasets" following completion of "all data cleaning activities up to the June 24, 2023 data cutoff." Complaint ¶ 61; Docket No. 74-2 at 35.

### *E. The Updated Data*

By February 13, 2024, Moderna had assembled updated data to respond to the FDA's request. *See* Complaint ¶ 59. This is the date as of which Plaintiff alleges "Defendants knew that the vaccine efficacy of mRESVIA was lower than 83.7%." *Id.* ¶ 63. On February 26, 2024, Moderna provided the FDA with the updated data. *Id.* ¶¶ 60–61. On May 29, 2024—just before the end of the Class Period—the FDA publicly disclosed that the updated data showed a vaccine efficacy of 78.7% due to identification of "additional RSV cases with onset prior to data cutoff which met the study case definition." *Id.* ¶ 61; Docket No. 74-2 at 35.

The Complaint is drafted so as to prevent any close evaluation of the plausibility of Plaintiff's assertion that the change from the 83.7% efficacy figure to the 78.7% figure amounted to a "correct[ion]." It is, of course, essential to Plaintiff's claim that the higher figure be treated as false or inaccurate—at least during the Class Period. But there is almost nothing in the Complaint to explain what changed in the data. And Plaintiff has moved to strike the ConquerRSV protocol and other clinical trial documents (Docket Nos. 72-17, 72-18, 72-19), Moderna's direct communications with the FDA (Docket Nos. 72-20, 72-21, 72-22), and the full

[3] Plaintiff acknowledges that "Exhibits 20 and 21 purport to be private communications between the FDA and Moderna," and that "[t]he dates of these communications match dates of communications cited in the BLA Review Memo." Nonetheless, Plaintiff challenges the authenticity of these exhibits because they "are not public." Docket No. 77 at 9.

publication of the original clinical trial results in the *New England Journal of Medicine* (Docket Nos. 72-34, 72-35). In other words, Plaintiff has challenged the authenticity and admissibility of the various documents that Defendants contend are needed to fill this narrative gap in the Complaint. *See* Docket No. 77 at 8–14.

The Court's review, under Rule 12(b)(6), is restricted to the allegations of the Complaint and the documents incorporated therein, and many of the documents submitted by Defendants have been stricken. *See* Order on Plaintiff's Motion to Strike Exhibits.

Given our narrowed field of view, the best indication of what changed is found in public remarks by Defendant Hoge on June 10, 2024, following the FDA's approval of mRESVIA. These remarks are indisputably incorporated by reference in the Complaint. *See* Complaint ¶ 60. Hoge explained the different efficacy computations as follows:

> The label data from the FDA approval process was 78.7% efficacy. The prior -- the primary analysis, as per protocol, primary analysis had been 83.7%, substantially the same numbers with the same overlap. So what's the differen[ce]? During the process of the review with the FDA, they asked us to include a set of cases, about 20 cases that were not confirmed at the time of the primary analysis. So these are people that might have developed a symptom, but at the time of the data cutoff by the DSMB, they had not had a PCR confirmation that it was RSV. It could have been COVID, it could have been flu, lots of other things were diagnosed during that time.
>
> When you're running a clinical trial and you're following the protocol, when you hit that data cutoff, we're blinded. We provide the data [to] the DSMB, and that blinded data was 83.7%. But the FDA and regulators have the privilege of being able to look retrospectively and decide if they want to include those numbers. And because it added about 20 more cases to that primary analysis, we ultimately agreed with the agency to include those because they broke 15 and 5, they slightly lowered the number by a couple of percent. But otherwise, it's substantially the same result.

Docket No. 72-16 at 3.[4]

[4] In a later section of this report, I will discuss the Complaint's characterization of Hoge's remarks.

In other words, the issue was whether or not to count cases of RSV where symptoms arose before the cut-off date of the study, but laboratory confirmation (PCR testing) to confirm the RSV diagnosis only occurred after the cut-off date.

There is no suggestion in the complaint that the 83.7% figure was inaccurate or misleading when Defendants publicized that figure prior to February 15, 2024. Plaintiff's counsel conceded as much at oral argument:

> THE COURT: . . . And you're saying because they chose not to fight the FDA on which methodology to use that their prior statements using their own methodology were false?
>
> MR. BIGIN: No. Their prior statements are fine. That's where we get a little confused in the overture of what's going on in the case.
>
> We didn't allege a case prior to the February class period.

Docket No. 91 at 38:2–14.

### *F. Allegedly False or Misleading Statements*

Defendants continued to cite the original efficacy figure for mRESVIA in public statements through May 2024.

The Complaint identifies seven occasions after February 13, 2024, on which Moderna cited the higher (83.7%) efficacy figure in statements that could reasonably have been seen by investors: (1) in a February 15, 2024, presentation published on its website (Complaint ¶ 66; *see* Docket No. 72-6); (2) during a February 22, 2024, earnings call (Complaint ¶ 67; *see* Docket Nos. 72-7, 72-8); (3) in a 2023 annual report filed with the Securities and Exchange Commission ("SEC") on February 23, 2024 (Complaint ¶ 68; *see* Docket No. 72-9); (4) in a public presentation to the Advisory Committee on Immunization Practices ("ACIP") on February 29, 2024 (Complaint ¶ 69; *see* Docket No. 72-10); (5) in another version of the 2023 annual report filed with the SEC on March 15, 2024 (Complaint ¶ 70; *see* Docket No. 72-11); (6) during its

annual vaccine day on March 27, 2024 (Complaint ¶ 71; *see* Docket Nos. 72-12, 72-13); and (7) during a May 2, 2024, conference call for analysts and investors (Complaint ¶ 72; *see* Docket No. 72-14).

As discussed below, there is no allegation that the difference in efficacy percentage between 83.7% and 78.7% had any effect on Moderna's prospects for FDA approval of its vaccine. Instead, the Complaint alleges that the higher number would have mattered to investors because it might affect Moderna's ability to compete with other manufacturers' RSV vaccines, and thus impact future revenues. *See* Complaint ¶ 65.

### *G. Announcement of FDA Approval*

On May 31, 2024, which marks the end of the Class Period, Moderna announced in a press release that the FDA had approved mRESVIA and that the FDA's approval reflected the lower efficacy figure. *Id.* ¶ 74; *see* Docket No. 72-15. Moderna's stock price fell $8.94 per share, or 5.9%, to close at $142.55 per share on that date. Complaint ¶¶ 75–76.

As discussed above, on June 10, 2024, Hoge spoke publicly about the recent approval, and about the commencement of Moderna's efforts to market mRESVIA. Hoge noted that competitors' sales efforts had already been "underway for a couple of months without us" but stressed three strengths of mRESVIA: (1) "really strong efficacy," (2) "a really compelling safety profile," and (3) "real ease of use" based on the pre-filled syringe format. Docket No. 72-16 at 3.

### *H. Competition in the RSV Vaccine Market*

Plaintiff cites a 2014 study that "found that on average first entrants" in the pharmaceutical market "achieve a 6% greater than fair-market-share advantage over later entrants," although "being first . . . is not everything, provided that a later entrant can offer a

superior product." *Id.* ¶ 39.[5] Plaintiff also quotes the study's finding that "it is not meaningfully worse to be fifth than second to market." *Id.* In this case, there were two other RSV vaccines approved before Moderna's: GlaxoSmithKline's Arexvy and Pfizer's Abrysvo.[6] *Id.* ¶¶ 49–51. Moderna informed investors in its 2023 Annual Report that its RSV vaccine would "face competition from existing RSV vaccines," and that it "may have difficulty achieving market share" as a result. *Id.* ¶ 42. In his June 2024 remarks, Hoge projected a multi-year effort to gain market share. *See* Docket No. 72-16 at 3 ("[W]e actually think that, that combination of safety profile, efficacy profile and real ease of use will win out in the market. And we do hope over 1, 2, 3 years of this launch, we will actually establish our fair share and maybe more with this product.").

### *I. This Litigation*

The initial complaint in this matter was filed on August 9, 2024. Docket No. 1. The Court appointed a lead plaintiff on May 28, 2025, and lead counsel on June 10, 2025. Docket Nos. 56, 59. The operative Complaint was filed on August 25, 2025, and Defendants moved to dismiss it on October 24, 2025. Docket Nos. 62, 71. Defendants filed a declaration with exhibits, a memorandum, and a reply in support of their motion to dismiss. Docket Nos. 72–73, 82. Plaintiff filed an affidavit with exhibits and an opposition in response to the motion. Docket Nos. 74–75.

---

[5] Another study cited by Plaintiff reaches the same conclusion, noting that biopharmaceutical products—especially those with "meaningful clinical differentiation"—can perform better than expected as late entrants to the market. Complaint ¶ 40.

[6] The vaccine efficacy of the first entrant to the RSV vaccine market (Arexvy) was 82.6%. *Id.* ¶ 51. This figure is slightly lower than the 83.7% figure that Moderna publicly cited during the Class Period, and somewhat higher than the 78.7% figure used in the FDA's approval of mRESVIA.

The motion was referred to me on May 7, 2026, for a report and recommendation. Docket No. 87. I held a hearing on the motion on June 18, 2026. Docket Nos. 90–91.

## II. Legal Standards

The Complaint in this case must be considered in light of both Federal Rule of Civil Procedure 12(b)(6) and the PSLRA[7] to evaluate whether it states a claim under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

### *A. Rule 12(b)(6)*

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

In applying this standard, the Court "employ[s] a two-pronged approach." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011). At the first prong, the Court must "identify[] and disregard[] statements in the complaint that merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action." *Id.* (citation modified). At the second prong, generally, "[n]on-conclusory factual allegations in the complaint must then be treated as true, even if seemingly incredible." *Id.* (citing *Iqbal*, 556 U.S. at 681). Furthermore, the Court may properly consider "an incorporated, uncontested document" that

[7] Because this is a fraud case, the Complaint must also meet the "heightened pleading standards" of Federal Rule of Civil Procedure 9(b), which requires that "the allegations 'constituting the fraud'" be pled with particularity. *Premca Extra Income Fund LP v. Angle*, 178 F.4th 712, 723 (1st Cir. 2026).

contradicts an allegation otherwise entitled to a presumption of truth. *See Newman v. Lehman Bros. Holdings Inc.*, 901 F.3d 19, 26–27 (1st Cir. 2018). "If th[e remaining] factual content, so taken, 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,' the claim has facial plausibility." *Ocasio-Hernandez*, 640 F.3d at 12 (quoting *Iqbal*, 556 U.S. at 678). This inquiry demands a "context-specific" approach, asking the Court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

### ***B. PSLRA Pleading Standards***

Beyond the ordinary standards of Rule 12(b)(6), the complaint in a private securities fraud action must satisfy the "[e]xacting pleading requirements" of the PSLRA. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007).

As to each alleged misrepresentation or omission, the PSLRA requires Plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).[8] As to scienter, Plaintiff must plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

### ***C. Section 10(b) of the Exchange Act and Rule 10b-5***

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j(b). Rule 10b-5 further specifies that it is unlawful, as relevant here,

---

[8] Plaintiff makes all "allegations upon information and belief, except as to those allegations concerning Plaintiff." Complaint ¶ 2.

to make a false statement or misleading omission "of a material fact . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

To establish a violation of Section 10(b) and Rule 10b-5, "a plaintiff must prove '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 460–61 (2013) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011)). Defendants challenge the sufficiency of the Complaint's allegations as to the first, second, and sixth elements. This report addresses the first and second elements: While the Complaint adequately alleges that there was a misrepresentation, Plaintiff's failure to adequately plead the second element, scienter, is fatal to the Complaint. This report need not reach the issue of loss causation. *See Zhou v. Desktop Metal, Inc.*, 120 F.4th 278, 287 (1st Cir. 2024) (district court must dismiss Section 10(b) and Rule 10b-5 complaint that "fail[s] to allege any one of these elements").

## III. Misrepresentation or Omission

To satisfy the first element of a Section 10(b)/Rule 10b-5 claim, Plaintiff must plead an "untrue statement" or omission of "a material fact."[9] 17 C.F.R. § 240.10b-5(b). Thus, an adequate pleading of such statement or omission under the PSLRA will "specify each statement alleged to have been misleading," as well as "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). For Plaintiff's securities fraud claim to proceed, the

[9] Materiality "should normally be left to a jury rather than resolved by the court on a motion to dismiss." *In re Cabletron Sys., Inc.*, 311 F.3d 11, 34 (1st Cir. 2002). The parties have focused their briefing on the sufficiency of the Complaint's allegations that Defendants' use of the 83.7% efficacy figure after February 2024 amounted to an untrue statement or omission. That will be the focus of this section of the report.

factual allegations of the Complaint, as to each statement and as to the reasons it is misleading, must plausibly support an inference that the statement included a misrepresentation or misleading omission. *See Iqbal*, 556 U.S. at 678.

Plaintiff describes seven statements made by Defendants during the Class Period, all repeating the same assertion that Plaintiff alleges was misleading: that the efficacy figure for mRESVIA was 83.7%. Complaint ¶¶ 79–101. What makes this figure misleading, Plaintiff alleges, is that Moderna's interactions with the FDA in the months leading up to the Class Period put Moderna on notice that FDA would insist on including updated data that would push the efficacy rate down to 78.7%. *See id.* ¶¶ 81, 85, 88, 91, 94, 98, 101. While the well-pleaded factual allegations of the Complaint don't go that far, the Complaint does plausibly allege that once Moderna assembled additional data, it was in a position to compute the lower efficacy figure.

The parties dispute the significance of these different efficacy computations. Defendants contend that the difference involves a mere difference of opinion about which data set to use. Plaintiff contends that it was flatly false (a misrepresentation) to keep using the higher number after the added data was assembled. Alternatively, Plaintiff contends that it was a misleading omission to use the higher number without at least noting the lower number.

Although it is a close call, the Complaint's allegations plausibly support an inference that there was a misrepresentation or omission.

### *A. Misrepresentation*

Defendants argue that their statements about the higher efficacy figure were fair and accurate statements that were properly based on previously-published primary analysis data. *See* Docket No. 73 at 29–31. Plaintiff responds that, once Defendants assembled additional data on February 13, 2024, the additional cases included in the updated data pointed to a lower efficacy

figure. Plaintiff contends that the FDA's ultimate decision to use the lower figure when it approved the vaccine at the end of May demonstrates that the lower number was the only proper figure to use after the updated data was assembled. *See* Docket No. 75 at 21–24. Although Plaintiff's brief significantly overstates the strength of this argument, there is enough in the Complaint to support the inferences that Plaintiff favors.

Defendants begin by asserting that the Complaint does not "plead any facts contradicting that the protocol-specified, DSMB-reviewed, *NEJM*-published 'primary analysis' demonstrated 83.7% VE based on 64 cases of RSV-LRTD."[10] Docket No. 73 at 29. In plain English, a reputable publication, the New England Journal of Medicine, published a report based on the original data set, which showed the higher figure. This seems to be undisputed, as far as it goes. Plaintiff does not contend that there was anything inaccurate about using the higher figure prior to the Class Period. *See* Docket No. 91 at 38:10 ("[Plaintiff's counsel]: No. Their prior statements are fine.").

The question is whether the Complaint adequately alleges that the FDA's follow-up communications, and the additional data that Moderna assembled in response to those communications, changed the picture so significantly that it was no longer accurate to keep using the 83.7% figure. The Complaint quotes, in bold and italicized typeface, a May 29, 2024, document in which the FDA states that it had requested additional data "[d]ue to inconsistencies noted in the original datasets." Complaint ¶ 61 (emphasis omitted). The Complaint also quotes

[10] As to the publication of study results, this case differs factually from a situation like that in *Corban v. Sarepta Therapeutics, Inc.*, where the defendant's publication of study results disclosed results for two possible study populations "and provided a rationale for the use of the [defendant's chosen] approach" to rely on only one of those populations. *See* No. 14-CV-10201-IT, 2015 WL 1505693, at *6 (D. Mass. Mar. 31, 2015) (Talwani, J.), *aff'd*, 868 F.3d 31 (1st Cir. 2017).

the FDA's conclusion, on May 29, 2024, that "[t]he updated datasets, submitted to the BLA on February 26, 2024, identified additional RSV cases with onset prior to data cutoff which met the study case definition." *Id.* (emphasis omitted); *see* Docket No. 74-2 at 35.

While the Complaint uses selective quotations to elide the point, there are no factual allegations in the Complaint that the FDA used the term "inconsistencies" in the *January* 2024 communication when it requested the additional data. Nor does the Complaint allege that the FDA communicated to Moderna, prior to May 2024, its ultimate conclusion that the additional data "met the study case definition." This point was discussed at oral argument:

> THE COURT: Okay. It seems like paragraph 61 is what you've got. You've alleged that they said this in May, and from this the Court should infer that what happened in February, January and February, was FDA said, we want to see more because we think what you have is false or wrong or incomplete in some material way and, therefore, we want you to update it. Is that [right]?
>
> MR. BIGIN: That's correct, your Honor.

Docket No. 91 at 44:8–15.

What the Complaint does allege is that, as of May 29, 2024, the FDA concluded that the added data should be included in the computation of efficacy for mRESVIA. As a matter of logic, the FDA's conclusion supports a plausible inference that the efficacy figure that had been computed without the added data was inaccurate.

With the limited universe of information this Court may consider on a motion to dismiss,[11] and drawing all reasonable inferences in Plaintiff's favor, the factual allegations of the Complaint suffice to make out a plausible claim that, as of February 13, 2024, the higher efficacy

[11] Defendants have offered a number of documents that they argue support the validity of the higher efficacy figure. But, at the motion to dismiss stage, the Court doesn't engage in factfinding, we consider only whether the Complaint (assuming its factual allegations are true) states a claim. Accordingly, I have separately allowed Plaintiff's Motion to Strike (Docket No. 76), various of the documents that Defendants have submitted.

figure was inaccurate. (As discussed below, this doesn't say anything about whether the FDA had *communicated*, prior to May 29, 2024, any view about whether or not the higher efficacy figure was accurate.)

Defendants argue that the mere fact that the FDA ultimately decided that the additional data should be included doesn't necessarily mean that the 83.7% efficacy figure was wrong or false during the Class Period, just that the FDA later saw the matter differently. Docket Nos. 73 at 29–30, 82 at 12; *see Ganem v. InVivo Therapeutics Holdings Corp.*, 845 F.3d 447, 457 (1st Cir. 2017) ("'[F]raud by hindsight' does not satisfy the pleading requirements in a securities fraud case." (quoting *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 62 (1st Cir. 2008)); *see also In re Genzyme Corp.*, No. 09-CV-11299-GAO, 2012 WL 1076124, at *11 (D. Mass. Mar. 30, 2012) (standing alone, "the fact that the FDA later made [a contrary] conclusion does not make earlier statements . . . false or misleading"), *aff'd sub nom. In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31 (1st Cir. 2014).

As discussed in later sections of this report, the cases Defendants cite offer support for their arguments about Defendants' knowledge and state of mind. But the analysis must begin with a consideration of whether the factual allegations of the Complaint support a plausible inference that Defendants' statements were, in a literal sense, inaccurate. If the Court were to engage in factfinding at this stage of the case, Defendants might well prevail, even on the question of falsity/inaccuracy. But, at this stage of the case, we are only considering the legal sufficiency of the Complaint and must assume the truth of Plaintiff's well-pleaded factual allegations. At bottom, the FDA's conclusion offers adequate support for Plaintiff's contention that there was a single correct way to view the data—in which case Defendant's view would

necessarily be inaccurate. The case law doesn't fully foreclose such an inference in Plaintiff's favor.

The federal courts are rife with securities fraud cases involving pharmaceutical companies' announcements about study results and FDA approval, but each turns on the specific facts at issue. Defendants attempt to analogize their situation to *Pizzuto v. Homology Medicines, Inc.*, No. 1:23-CV-10858-AK, 2024 WL 1436025 (D. Mass. Mar. 31, 2024). In *Pizzuto*, Judge Kelley considered statements about clinical trials that were underway at the time, where the company disclosed information for various phased data cutoff dates as each cutoff date passed (and didn't add negative data for later phases that weren't yet complete). *Id.* at *4–5. In that context, the court found, statements "limited to data before a specified cutoff date . . . cannot be considered misleading by 'clinical data that occurred after that cut-off date.'" *Id.* at *8 (quoting *In re Biogen Idec, Inc. Sec. Litig.*, No. 05-CV-10400-WGY, 2007 WL 9602250, at *12 (D. Mass. Oct. 25, 2007), *aff'd sub nom. N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35 (1st Cir. 2008)). The problem for Defendants is that, in this case, we're not talking about ongoing clinical studies. Unlike in *Pizzuto*, this case involves statements about a study that had been completed over a year before. The question is whether the results of that study were being accurately described.

Defendants also argue that it is a matter of opinion which data should be considered. *See* Docket No. 73 at 32–33. In other words: Was it better to stick with the original data, or to consider additional data assembled and analyzed over a year after the initial cutoff date? *See* Docket No. 82 at 14–15.

Before we turn to the fact/opinion dispute, we need to consider *when*, on Plaintiff's allegations, the information became available that—at least plausibly—rendered the higher

efficacy figure inaccurate. Plaintiff bears the burden to "plead specific facts 'showing that the statements presented to the public were false or misleading *at the time they were made*.'" *City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp.*, 46 F.4th 22, 35 (1st Cir. 2022) (emphasis added) (quoting *Suna v. Bailey Corp.*, 107 F.3d 64, 69 (1st Cir. 1997)).

In this case, we are looking for factual allegations that support a plausible inference that—before or during the Class Period—available data pointed to the lower efficacy figure for mRESVIA.

To make out such an inference, Plaintiff points to five events alleged in the Complaint. *See* Docket No. 75 at 21. The following paragraphs will assess these allegations:

First, Plaintiff alleges that "[o]n January 25, 2024, . . . FDA requested that [Moderna] complete all data cleaning activities up to the June 24, 2023 data cutoff and submit updated datasets for FDA review." Complaint ¶ 57 (first and third alteration in original); *see id.* ¶¶ 56, 58 (Plaintiff's characterizations of same). In response, Defendants point to the text of the January 25, 2024, communication from the FDA, *see* Docket No. 73 at 31 (citing Docket No. 72-20), but I do not consider that document, which is not properly before the Court at this stage. Even without considering the actual communication, the mere fact that the FDA requested "updated datasets for FDA review" does not support a plausible inference that the original data (supporting the higher efficacy figure) was incorrect. Plaintiff's conclusory characterization of the FDA's request as seeking "corrected data" cannot cure the deficiencies of this factual allegation. At oral argument, Plaintiff's counsel effectively conceded as much. *See* Docket No. 91 at 33:21–34:23.

Second, Plaintiff alleges that "[o]n February 13, 2024, Defendants extracted and corrected the dataset for the ConquerRSV Trial with the November 30, 2022 data cut off with [sic] showed a 78.7% vaccine efficacy." Complaint ¶¶ 59, 63. Plaintiff cites in support the

FDA's approval document, the May 31, 2024, Summary Basis. *Id.* ¶ 59. Plaintiff has provided the full document, which lists the lower efficacy figure with "data cutoff 30 Nov 2022; data extraction 13 Feb 2024." Docket No. 74-1 at 24. Plaintiff has adequately pled that the data that Moderna assembled on February 13, 2024, yielded a lower efficacy figure, and we must take such allegation to be true at this stage. Giving Plaintiff the benefit of all reasonable inferences, there is a plausible inference that the newly assembled data rendered the higher efficacy figure inaccurate as of February 13, 2024. This aligns with Plaintiff's start of the Class Period two days later, on February 15, 2024, the date of the first statement that Plaintiff challenges as false.

Third, Plaintiff alleges that on February 26, 2024, Moderna submitted to the FDA "updated datasets" that "identified additional RSV cases with onset prior to data cutoff which met the study case definition." Complaint ¶ 61; *see* Docket No. 74-2 at 35 (same). In response, Defendants again point to Moderna's communications with the FDA, *see* Docket No. 73 at 31 (citing Docket Nos. 72-21, 72-22), both of which Plaintiff objects to, and so are not considered here. Even without looking beyond the Complaint, there's no allegation that the FDA communicated in February 2024 its ultimate conclusion that the additional cases "met the study case definition." Thus, this allegation doesn't advance Plaintiff's claim any farther; Defendants may have been in a position to compute the lower efficacy rate (as of February 13), but there's nothing to suggest that Defendants knew what the FDA would ultimately decide about whether to base the efficacy rate on the added data.

Fourth, Plaintiff alleges that Moderna published the lower efficacy figure in its May 31, 2024, press release. Plaintiff contends that this constitutes an admission that the lower figure was accurate. Complaint ¶¶ 74, 81. Defendants point out that, in the press release, Moderna repeated that the primary analysis showed the higher efficacy figure and that a subsequent analysis during

FDA review produced the lower efficacy figure that was included on the label. Docket No. 73 at 31; *see also* Docket No. 72-15 at 2. Plaintiff's characterization of this press release as an admission strains credulity. While Plaintiff is entitled to the plausible inference that, once Moderna assembled the additional data, the lower figure was rendered inaccurate, the May 31 press release is—at best—consistent with that inference. It does not strengthen it.

Fifth, Plaintiff alleges that Hoge reported, on June 10, 2024, that Moderna "ultimately agreed" with the FDA to include the additional cases in the efficacy data. Complaint ¶¶ 60, 64; *see* Docket No. 72-16 at 3 ("[T]he FDA and regulators have the privilege of being able to look retrospectively and decide if they want to include those numbers. And because it added about 20 more cases to that primary analysis, we ultimately agreed with the agency to include those . . . ."). As I will discuss in detail below, notwithstanding Plaintiff's strained reading of Hoge's statement, that statement contains no admission that Moderna believed during the Class Period that the lower efficacy figure was the correct one. Again, Plaintiff is entitled to a plausible inference that, once Moderna assembled the additional data, the lower figure was rendered inaccurate. But Hoge's June 10 statement is—at best—consistent with that inference. It doesn't add anything more about Defendants' knowledge during the Class Period.

***B. Opinion***

Defendants also argue that the challenged statements express opinions on matters of scientific interpretation. *See* Docket No. 73 at 32–33. Plaintiff responds that the challenged statements are instead factual assertions. Plaintiff points out that the efficacy figure is a matter of computation and emphasizes that there are no markers in the statements to suggest that Moderna was uncertain, or offering an opinion, about that figure. *See* Docket No. 75 at 27–29.

The Supreme Court's *Omnicare* decision is the benchmark for considering fact versus opinion in securities fraud cases: "A fact is 'a thing done or existing' or '[a]n actual

happening.' . . . [A] statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not." *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015) (citations omitted) (first alteration in original) (quoting Webster's New International Dictionary 782 (1927)). Under the *Omnicare* analysis, even the alleged *import* of Defendants' statements (that mRESVIA had the highest vaccine efficacy among competitors) would be "a determinate, verifiable statement." *See id.* at 183–84 (explaining that statement that "[t]he TVs we manufacture have the highest resolution available on the market" "would be an untrue statement of fact if a competitor had introduced a higher resolution TV a month before—even assuming the [speaker] had not yet learned of the new product"). This suggests at the outset that Defendants' statements reporting the higher efficacy figure were verifiable statements expressing certainty about the efficacy.

Most of the cases upon which Defendants rely for their "opinion" argument deal with qualitative interpretations of clinical trial data and qualifying statements. One of the few cases addressing a difference in quantitative interpretations of data is *In re Karyopharm Therapeutics Inc., Securities Litigation*, another decision out of this district. There, the defendant submitted to the FDA real world data,[12] which "was not pre-specified or reviewed by the FDA," to be used for "supportive analysis" in its new drug application. *See* 552 F. Supp. 3d 77, 84 (D. Mass. 2021), *aff'd sub nom. Thant v. Karyopharm Therapeutics Inc.*, 43 F.4th 214 (1st Cir. 2022). The defendant then "discussed with its investors its interpretation" of the real-world data, reporting

---

[12] "Real-world data [RWD] are data relating to patient health status and/or the delivery of health care routinely collected from a variety of sources. Examples of RWD include data derived from electronic health records, medical claims data, data from product or disease registries, and data gathered from other sources (such as digital health technologies) that can inform on health status." *Real-World Evidence*, FDA (June 3, 2026), https://www.fda.gov/science-research/science-and-research-special-topics/real-world-evidence.

that the median survival period of patients who received their cancer drug was longer than the survival period for patients in the real world. *Id.* "The FDA subsequently adjusted the data based on perceived methodological errors, however, and determined that the median overall survival in the real world was actually" longer than survival for patients receiving the cancer drug. *Id.* On those facts, the court concluded that the discrepancy in "real-world survival rates calculated by the defendants and the FDA" was a matter of opinion, that is, "a non-actionable scientific disagreement." *Id.* at 89.

In contrast with the situation just discussed in *Karyopharm*, there are in this case factual allegations that Defendants assembled—and provided to the FDA—datasets that "identified additional RSV cases with onset prior to data cutoff *which met the study case definition*." *See* Complaint ¶¶ 59–61 (emphasis added). The mere fact that the FDA announced this conclusion in late May, does not, of course, foreclose the possibility that Defendants might ultimately prevail on an "opinion" defense (after all, experts can disagree about "definitions"). But, for purposes of an initial pleading, Plaintiff's allegation that the FDA used the term "definition" in this context brings the present case within *Omnicare*'s sphere of fact as "a determinate, *verifiable* statement." 575 U.S. at 184 (emphasis added). A "definition" points to the prospect of objective criteria by which to verify the statement.

The statements challenged here also differ from cases where defendants have provided *qualitative* interpretations of study results. In *Shash v. Biogen, Inc.*, for example, the challenged statements (all held to be opinions) did not recite any quantifiable study results but rather generally described the import of study data, such as stating that the data "support[ed] the positive findings" from a higher dose. 84 F.4th 1, 8–9 (1st Cir. 2023). Similarly, in *Pizzuto*, the statements held to be opinions included that "the safety and efficacy data [was] 'positive.'" 2024

WL 1436025, at *9. Likewise, in *Leavitt v. Alnylam Pharmaceuticals, Inc.*, the challenged statements offered opinions as to whether efficacy data were generally strong enough to support FDA approval for a particular treatment application, as opposed to quoting a specific efficacy figure. *See* 451 F. Supp. 3d 176, 183–84 (D. Mass. 2020). In other words, *Leavitt* supports the proposition that, absent specific allegations of falsity, a defendant's taking a different approach than the FDA, especially in the qualitative interpretation of data (such as whether the data supports approval), reflects a difference of opinion. *See id.* at 184 ("Without specific allegations of falsity, opinions interpreting the results of a clinical study are not actionable."). The qualitative statements in these other cases are not analogous to the statement challenged in this case: that the higher efficacy figure was an accurate computation of mRESVIA's efficacy.

Importantly, the Complaint in this case does not accuse Defendants of misleading investors about Moderna's prospects for securing FDA approval for its vaccine. The claim is that Defendants' misstatement about the vaccine's efficacy rate misled investors about how well mRESVIA was likely to sell after approval.

It may be that Defendants can establish—as a factual matter—that the differences between the two efficacy figures reflected a mere difference of opinion. At the pleading stage, however, Plaintiff has plausibly alleged that there was a difference of fact.

Defendants' challenged statements did not feature any qualifying language to signal an expression of opinion, unlike some of the cases upon which they rely. In *Shash*, for example, a core challenged statement contained the exact language the *Omnicare* Court posited to signal an opinion: "*I think* our data are all consistent with that." *Shash*, 84 F.4th at 9 (emphasis added). Likewise, in *Brill v. Invivyd, Inc.*, the challenged statements were determined to express opinions because they "convey[ed] a lack of certainty." No. 1:23-CV-10254-JEK, 2024 WL 4228832, at

*8 (D. Mass. Sept. 18, 2024). Although there are no magic words required to signal an opinion or to convey a lack of certainty, *see Pizzuto*, 2024 WL 1436025, at *13, Defendants' statements quoting the higher efficacy figure do not fit the bill.

Because the statements are not opinions, they do not fall within the opinion liability framework described in *Omnicare*, so there's no need to delve into the parties' arguments on that score.

### ***C. Omission***

As to Plaintiff's omission theory of liability, Defendants argue for dismissal on the basis that Moderna had no duty to disclose the updated data sets provided to the FDA. *See* Docket No. 73 at 31–32. Plaintiff responds that once Defendants decided to make statements publicizing the higher efficacy figure during the Class Period, they had a duty to disclose the lower efficacy figure calculated from the February 13, 2024, data. *See* Docket No. 75 at 25. In other words, Plaintiff's theory is that, even if the challenged statements were not outright false, it was misleading for Defendants to repeat the higher figure without acknowledging that updated data requested by the FDA produced the lower figure. Plaintiff has the better of the arguments on this issue, at least as to stating a plausible claim.

If a company chooses to speak, it must avoid misleading "half-truths, painting a materially false picture in what they say because of what they omit." *Sec. & Exch. Comm'n v. Johnston*, 986 F.3d 63, 72 (1st Cir. 2021) (citing 17 C.F.R. § 240.10b-5(b)). That said, "a company is not, by virtue of making *some* disclosures about its products, obligated to disclose *all* potentially interesting information." *Thant*, 43 F.4th at 226. Thus, the question is whether that updated data is merely potentially interesting information or whether its omission "paint[s] a materially false picture." *See State Tchrs. Ret. Sys. of Ohio v. Charles River Lab'ys Int'l, Inc.*, 152 F.4th 1, 11 (1st Cir. 2025).

Defendants seek to characterize any omission as a mere failure to disclose "every communication with the FDA." *See* Docket No. 73 at 32 & n.19; *see also, e.g.*, *Yan v. ReWalk Robotics*, 973 F.3d 22, 40 (1st Cir. 2020); *Corban v. Sarepta Therapeutics, Inc.*, 868 F.3d 31, 40 (1st Cir. 2017). This characterization fairly applies to the FDA's January 25, 2024,[13] request for updated data. *See* Complaint ¶¶ 56–58. As discussed above, Plaintiff's counsel conceded at oral argument that Plaintiff has no factual basis to support the Complaint's assertion that the FDA used the term "corrected data" in its request to Moderna. *See* Docket No. 91 at 33:21–34:23. So we're talking about the bare fact that the FDA requested updated data. The mere fact that the FDA asked for more information did not render inaccurate any of Defendants' statements about the efficacy of their vaccine. *Cf. In re Genzyme Corp.*, 2012 WL 1076124, at *10 (noting that even receipt of an FDA "Warning Letter" did not establish that pharmaceutical company was aware of deficiencies in its manufacturing controls).

As of February 13, 2024, by which time *Moderna* had assembled the updated data, Plaintiff has plausibly alleged that the picture changed. The relevant omission would be the updated data itself, not the mere fact that the FDA had requested an update. Based on the Complaint's allegation that the updated data identified additional cases that fall within the study's case definition, Complaint ¶ 61, the Complaint plausibly alleges that it was inaccurate to continue to publicize the 83.7% figure, while omitting to mention that updated data pointed to a lower figure.

Having concluded, on the restricted record available at this stage of the case and drawing all inferences in Plaintiff's favor, that Plaintiff has adequately alleged a misrepresentation or omission, I will turn, in the next section of this report, to the question of scienter.

[13] This date falls before the Class Period, which begins on February 15, 2024. Complaint ¶ 9.

## IV. Scienter

While the Complaint clears the threshold of plausibly alleging falsity, it does not surmount the hurdle of the PSLRA's requirements for alleging scienter.

As the First Circuit has noted, "[s]cienter under the PSLRA is 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Premca Extra Income Fund,* 178 F.4th 712, 727 (1st Cir. 2026) (quoting *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002)). Plaintiff must "plead 'either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness,'" which "demands 'a highly unreasonable omission.'" *Corban*, 868 F.3d at 37 (quoting *Aldridge*, 284 F.3d at 82, then quoting *In re Smith & Wesson Holding Corp. Sec. Litig.*, 669 F.3d 68, 77 (1st Cir. 2012)).

Unlike the 12(b)(6) standard for pleading falsity,[14] for scienter, a merely plausible inference will not do the trick. The PSLRA requires that the Complaint allege particularized "facts giving rise to a strong inference that the defendant acted with" such a state of mind. 15 U.S.C. § 78u-4(b)(2)(A). As the Supreme Court has instructed, under the PSLRA standard "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent *and at least as compelling as any opposing inference* one could draw from the facts alleged." *Tellabs, Inc.*, 551 U.S. at 324. The facts alleged in the Complaint "must . . . present a *strong* inference of scienter. A mere reasonable inference is insufficient to survive a motion to dismiss." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 (1st Cir. 1999).

[14] The PSLRA requires Plaintiff to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). This is a departure from the usual standards of Federal Rule of Civil Procedure 8, similar in some respects to the fraud pleading standards of Federal Rule of Civil Procedure 9(b). This requirement of pleading with specificity doesn't affect the operation of Rule 12(b)(6).

We'll begin with an overview of the competing inferences, as presented by the parties. Plaintiff asks the Court to infer that "the FDA rejected the original primary analysis data" in January 2024, that "Defendants corrected miscategorized cases and erroneous data" the next month, that "Defendants agreed with the FDA in February 2024 that the corrected datasets should be used," and that Defendants had "a strong motive to conceal the lower" efficacy in order to persuade investors that Moderna was "a platform company" well situated to compete for market share in the RSV vaccine market. Docket No. 75 at 42.

Defendants, on the other hand, offer the following interpretation: Before and after February 2024, Moderna accurately described what data it was publishing and warned that the FDA could view the data differently, Moderna provided additional data as requested by the FDA while disputing whether the additional data ought to be used to calculate efficacy, and Moderna disclosed the final label efficacy once the FDA made an approval determination. Docket No. 73 at 41–42. Defendants point out that it would not have served their interests to misrepresent the efficacy of the vaccine, given that it was up to the FDA to decide which efficacy figure to adopt, and given that the FDA's choice would be publicly disclosed within a few months, when the vaccine was approved. *Id.* at 42.

Defendants present the more cogent and compelling set of inferences as to scienter. As discussed in this section of the report, the Complaint does not adequately allege scienter as required by the PSLRA, and I recommend that it be dismissed on that basis.

Because various types of factual allegations may be used to show scienter, it is a "fact-specific inquiry." *Greebel*, 194 F.3d at 196. Scienter may be shown through allegations "tending directly to show conscious wrongdoing on the part of defendants"—that is, allegations of knowledge of material falsity—and from "circumstantial evidence from which such wrongdoing

may be inferred, including that the defendants had both motive and opportunity." *See id.* at 201. Although a complaint need not include allegations "of the 'smoking-gun' genre" to proceed, *Tellabs, Inc.*, 551 U.S. at 324, there must at least be allegations sufficient to support a strong inference of scienter.

In this case, there is precious little in the factual allegations of this Complaint to support even a *plausible* inference of scienter, let alone a strong inference. The Complaint includes no well-pleaded factual allegations to suggest that Defendants actually believed during the Class Period that the lower efficacy figure was the correct one, or even that it was the figure that the FDA would ultimately adopt. Still less is there any compelling inference that Defendants had any motive to lie about it.

### A. *Knowledge—or Extreme Reckless Disregard—of Falsity*

Plaintiff first attempts to marshal support for an inference that the Defendants knew or recklessly disregarded that the higher efficacy figure was materially false and, therefore, that Defendants acted with scienter in repeating that efficacy figure in their statements to investors. *See* Docket No. 75 at 31–36. The problem for Plaintiff is that, once the Complaint's conclusory statements and characterizations are removed, the well-pleaded factual allegations of the Complaint offer scant support for the inference he seeks.

- Plaintiff asks this Court to draw an inference that the FDA "reject[ed]" the original data. Docket No. 75 at 32. But Plaintiff points only to the FDA's language, quoted in the Complaint, that "FDA requested . . . updated datasets for FDA review." Complaint ¶ 57. There's no reason to suppose that a request for "updated datasets" is equivalent to, or even prefigures, a rejection of existing data.

- Plaintiff presses an inference that Moderna "corrected" the data when it provided those updated datasets, Docket No. 75 at 33, but Plaintiff's counsel has since conceded that the term "corrected" is Plaintiff's own characterization, not drawn from the FDA's words or Moderna's. *See* Docket No. 91 at 33:21–34:23.
- Plaintiff's argument requires the Court to assume that Moderna knew, from the moment it assembled the updated data, that the updated data should definitively be included in the calculation of efficacy going forward, with no room for debate with the FDA. *See* Docket No. 75 at 31–32. But the only support for this inference is the bare fact that, at the end of May 2024, the FDA concluded that the additional data "met the study case definition." Complaint ¶ 61.

In short, even if we accept as plausible Plaintiff's allegation that the 83.7% figure was inaccurate as of February 13, 2024, the only thing to support an inference that Defendants *knew* the original figure was inaccurate is the bare fact that they had assembled data that yielded a different, lower figure (and thus would have been aware that there was a way of considering the clinical trial data that would yield a lower efficacy percentage).

The allegations that support a plausible inference of *falsity* do not automatically do the same work for *knowledge or reckless disregard of* falsity. Although we must make a reasonable inference in Plaintiff's favor in accepting the FDA's conclusion that the new data "met the study case definition," *id.*, it is quite another leap to infer that Defendants understood that *only* the lower efficacy figure was accurate, or even that Defendants anticipated the FDA would adopt the lower figure.

The more compelling inference to be drawn from the FDA's request for additional data is that Defendants knew the FDA was evaluating all available data, including both efficacy figures,

during its review process. The mere fact that the FDA was considering alternative approaches does not do much to dispel the (entirely plausible) inference that Defendants held an honest belief that the updated data should not be included in the computation of the efficacy rate for mRESVIA. This innocent inference is also consistent with the FDA's own statement, in an exhibit proffered by Plaintiff, that Moderna's original "primary efficacy analysis was conducted based on the *protocol-specified* interim analysis of clinical RSV disease cases accrued through November 30, 2022." Docket No. 74-1 at 20 (emphasis added). While the FDA ultimately included additional data in its computation of the efficacy rate for mRESVIA, nothing in the FDA's statement suggests that there was anything dishonest or even inaccurate in Moderna's prior computation.

Plaintiff contends that it is "out-of-bounds" and "speculative," and "stretch[es] the imagination," to suppose that Defendants continued to believe that the higher efficacy figure was accurate after they assembled the additional data. *See* Docket No. 75 at 32. But this hyperbole does not make up for the glaring absence of any factual allegations to support Plaintiff's contention. Just as in *Leavitt v. Alnylam Pharmaceuticals, Inc.*, we are "missing . . . any [well-pleaded factual] allegation that the FDA, at any time prior to the release of its [final decision] . . . expressed to defendants its disapproval of [the original] data." 525 F. Supp. 3d 259, 266 (D. Mass. 2021).

It is, of course, conceivable that Defendants harbored the beliefs that Plaintiff attributes to them, but conceivability is not enough to survive a motion to dismiss under a conventional pleading standard, let alone the heightened standard of the PSLRA. *See Twombly*, 550 U.S. at 567, 570 (concluding, in the face of an "obvious alternative explanation" for alleged misconduct,

that the "plaintiffs here have not nudged their claims across the line from conceivable to plausible.").

Plaintiff's cases do not support a contrary view of the available inferences regarding scienter. In *Aldridge*, the critical information that was withheld from the public concerned the defendants' practice of offering "price protection and take back arrangements." 284 F.3d at 82. Given that the information in question concerned the defendants' own business practices, it was reasonable to infer that "the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete." *Id*. at 82–83. Here, by contrast, Plaintiff's inferences rest on an unsupported assumption that Moderna somehow knew what the FDA was thinking. The bare fact that the FDA had requested updated data during its review process does not support an inference that Defendants somehow knew that the FDA would ultimately decide to include additional cases in the efficacy computation.

In *Shash*, the First Circuit "infer[red] that Defendants were aware of the contradictory subgroup data" and that it was "highly unreasonable" to not acknowledge that data when they publicly asserted that "*all* data" supported a particular view. 84 F.4th at 14 (emphasis added). That inference was possible "precisely because of what the 'all data' statement represented." If a defendant expresses that "all data" is consistent with its view, it is misleading to withhold known data that is *inconsistent* with that same view. *Id.* At bottom, *Shash* stands for the proposition that a defendant can't say "all" unless it's really "all."

This case presents a more nuanced issue of falsity than *Shash.* In contrast to claiming that "all data" supported the challenged statements about the higher efficacy figure, Defendants told investors *which* data supported the higher figure, namely the data published in 2023. The challenged statements include multiple references to the 2023 publication of the primary analysis

data available as of that time. *See, e.g.*, Docket No. 72-6 at 5 (referencing "Wilson et al. NEJM, 2023"); Docket No. 72-7 at 4 (same); Docket No. 72-10 at 4–5 (same); Docket No. 72-11 at 3 ("These data were published in the *New England Journal of Medicine* in December 2023."); Docket No. 72-12 at 4 (providing URL for NEJM publication).[15] Moderna also warned investors that "the FDA and other regulators may interpret data from our clinical trials differently than we do." Docket No. 72-9 at 24.[16] These are important distinctions from *Shash*.

Plaintiff attempts to liken the facts alleged here to cases in which companies have failed to disclose the "FDA's serious criticism." *See* Docket No. 75 at 34. But those cases involved defendants who soft-pedaled criticisms from the FDA and thus misled investors about the timeline for, and likelihood of, FDA approval. *See Sanders v. AVEO Pharm., Inc.*, No. CIV.A. 13-11157-DJC, 2015 WL 1276824, at *8 (D. Mass. Mar. 20, 2015) (FDA asked defendant to postpone New Drug Application submission and to conduct a second clinical trial); *In re Transkaryotic Therapies, Inc. Sec. Litig.*, 319 F. Supp. 2d 152, 159 (D. Mass. 2004) (FDA

---

[15] For two of the challenged statements, the excerpts that Defendants have submitted as exhibits do not explicitly reference the NEJM publication. The NEJM isn't cited in the excerpt of the earlier version of the 2023 Annual Report dated February 23, 2024 (Docket No. 72-9), although it does appear in the subsequent version of the same Annual Report (Docket No. 72-11). Likewise, "NEJM" doesn't appear in the excerpted Investor Day slide deck dated May 2, 2024 (Docket No. 72-14).

It does not make a difference whether Defendants included an identical citation to the NEJM publication alongside every single statement. *Cf. Thant*, 43 F.4th at 222 ("It is not a material omission to fail to point out information of which the market is already aware." (citation modified) (quoting *Baron v. Smith*, 380 F.3d 49, 57 (1st Cir. 2004))). Overall, the challenged statements reflect that Defendants clearly identified the source of the higher efficacy figure. Plaintiff doesn't dispute this point.

[16] Plaintiff argues that "Defendants merely warn[ed] of hypothetical risks that had already occurred." Docket No. 75 at 35 n.19. This argument rests upon an assumption, not supported by the factual allegations of the Complaint, that the FDA had rejected the original data well in advance of its final approval decision, and that Moderna had been informed, or somehow predicted, that the FDA would adopt such a position.

concluded defendant's studies did not show efficacy and required defendant to conduct additional clinical studies); *In re Biogen Sec. Litig.*, 179 F.R.D. 25, 29–30 (D. Mass. 1997) (FDA expressed concern about drug efficacy due to a "fail[ure] to show efficacy at [the Phase II clinical trial] primary and secondary endpoints").

These cases have scant bearing in this case, where there is no allegation that the difference in efficacy figures was likely to have any impact on FDA approval, and mRESVIA was, in fact, approved. Complaint ¶ 102. At oral argument, Plaintiff's counsel acknowledged this point:

> [THE COURT:] We have no allegation here that Moderna mischaracterized its dealings with the FDA, correct?
>
> MR. BIGIN: That's correct, your Honor.
>
> THE COURT: All right. And no suggestion that they overstated or misstated the likelihood of FDA approval of their product?
>
> MR. BIGIN: No, your Honor.

Docket No. 91 at 32:5–12.

Plaintiff's attempt to analogize this case to one in which a company misrepresents its dealings with the FDA fails because it depends on a critical unsupported inference. Namely, that the FDA's request for additional data was tantamount to a rejection of the original data and that Defendants somehow understood that to be the case.[17]

[17] As discussed above, any relevant omission in this case concerns Plaintiff's claim that Defendants should have disclosed the updated data. Leaving aside Plaintiff's unsupported assumption that the FDA "rejected" the original data in January or February of 2024, Plaintiff does not suggest that Defendants were obligated to disclose the mere fact that the FDA had requested additional data. *See* Docket No. 75 at 25–27.

*1. Materiality*

Defendants contend that mRESVIA's specific efficacy figure was not material—or even relevant—to investors. *See* Docket No. 73 at 40. Plaintiff responds, consistent with his top-of-the-market theory, that the efficacy figure was material to Moderna's commercial prospects in the RSV vaccine market—and therefore to investors. *See* Docket No. 75 at 25–26.

We can assume, for purposes of this report, that the Complaint plausibly alleges that the vaccine efficacy figures for mRESVIA would be material to investors. However, in weighing the Complaint's allegations of scienter, it makes sense to consider the *strength* of any such inference. If the information in question was only marginally significant, this undermines any inference that Defendants acted with an intent to deceive investors.

As the First Circuit has noted, "[t]he question of whether a plaintiff has pled facts supporting a strong inference of scienter has an obvious connection to the question of the extent to which the omitted information is material." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 757 (1st Cir. 2011). The Defendants' state of mind as to a particular fact is "intimately bound up with whether Defendants either actually knew or recklessly ignored that the fact was material and nevertheless failed to disclose it." *Id.* (citation modified) (quoting *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1265 (10th Cir. 2001)). Therefore, "[i]f it is questionable whether a fact is material or its materiality is marginal, that tends to undercut" any inference of scienter. *Id.*

To start with the obvious, the common reason clinical trial data may matter to investors is that such data may affect a company's prospects of obtaining FDA approval for its product. Plaintiff has acknowledged that this was not an issue here. Whichever efficacy figure the FDA ultimately adopted, 83.7% or 78.7%, it was ample to garner FDA approval. *See* Docket No. 91 at

37:9–38:10. Thus, there is no suggestion that Moderna was sugarcoating its chances for FDA approval.

While it is conceivable that Defendants harbored a belief that the difference between 83.7% and 78.7% would matter to investors, the Complaint is devoid of evidence to support such an inference. Plaintiff's theory is that Moderna was exaggerating the mRESVIA efficacy figures in order to overstate its competitive position, compared to other companies' approved vaccines. If Defendants intended to defraud investors by intentionally overstating the efficacy figures for mRESVIA, one would expect to see some factual allegation that Defendants made public representations that the 83.7% figure would be a selling point for mRESVIA. But there are no allegations in the Complaint that Defendants' public announcements to the investing public ever compared mRESVIA's efficacy figure to the efficacy figures for competitors' products.[18]

Rather than pushing comparisons of efficacy rates, Defendants' communications to investors emphasized an entirely different point of competition. What Defendants said differentiated the product from competitors' vaccines is that mRESVIA would be the "[o]nly pre-filled syringe product available upon launch." Docket No. 72-14 at 4. As Bancel explained on February 22, 2024: "We expect to be the only company to offer an RSV vaccine in ready-to-use prefilled syringe, or PFS. . . . As you know, one of our competitors' product requires 9 steps of preparation for each consumer needing a RSV vaccine, and the other competitor's product requires 4 steps of preparation." Docket No. 72-8 at 6.

[18] The Complaint alleges that, in January 2023, a couple of *analysts* compared mRESVIA's efficacy figure to competitors' vaccines, a year before the updated data was assembled. *See* Complaint ¶ 48. This falls short of supporting an inference that *Defendants* believed during the Class Period that a 5% difference in mRESVIA's efficacy rate would matter to investors.

Whether a difference of 5% in efficacy rate would be material to vaccine buyers (and thus, potentially, to investors) is not a question to be resolved at this stage. However, in light of Defendants' public statements that cut against Plaintiff's theory of materiality—and in the absence of any factual allegations to support it—it is fair to say that materiality is doubtful. This is particularly so where the difference does not appear to have been material to the FDA. *See* Complaint ¶ 102 ("Moderna issued a press release 'announc[ing] that the [FDA] has *approved* mRESVIA . . . ." (alterations in original) (emphasis added)).

In sum, it's hard to draw an inference that Defendants harbored a conscious intent to deceive the investing public about something that Defendants didn't emphasize as a competitive differentiator for their product. This questionable materiality cuts further against an inference of scienter. *See Waters Corp.*, 632 F.3d at 757.

*2. Purported Admissions*

On a different tack, Plaintiff contends that Defendant Hoge's remarks, made after the FDA's approval of mRESVIA, amount to admissions that the FDA's efficacy computation was correct and that Moderna knew its own figures were incorrect. If indeed Hoge had made such an admission, that would be significant evidence of scienter. But Plaintiff's assertions, and the allegations of the Complaint, rest upon a selective quotation that is contradicted by the full text of the document on which Plaintiff relies.

Given that the Complaint purports to quote Hoge's remarks, the actual text of the remarks is incorporated by reference in the Complaint. As between the Complaint's characterization and the document itself, the document controls. "[I]t is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *Yacubian v. United States*, 750 F.3d 100, 108 (1st Cir. 2014) (quoting *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 229 n1 (1st Cir. 2013))).

At the heart of Plaintiff's contention that Defendant Hoge has made an admission that supports an inference of scienter is the Complaint's assertion that "Hoge conceded that presumably after dialogue with the FDA, 'we ultimately agreed' with the FDA that these 'about 20 new cases' of RSV should be included in the efficacy data, and thus counted against the vaccine efficacy rate." Complaint ¶ 60.

To start with a quibble, there is nothing in Hoge's words—which are quoted in the "Background" section of this report—to suggest he "conceded" anything. The real problem, however, is that the Complaint wrenches Hoge's words out of context to suggest that Defendants "ultimately agreed" that "'about 20 new cases' of RSV *should* be included in the efficacy data." *Id.* (emphasis added). What Hoge said, in relevant part, is:

> When you're running a clinical trial and you're following the protocol, when you hit that data cutoff, we're blinded. . . . [T]he FDA and regulators have the privilege of being able to look retrospectively and decide if they want to include those numbers. And because it added about 20 more cases to that primary analysis, we ultimately agreed with the agency to include those because they broke 15 and 5, they slightly lowered the number by a couple of percent. But otherwise, it's substantially the same result.

Docket No. 72-16 at 3. While Hoge says that Moderna had "ultimately agreed with the agency to include" the additional cases, nothing in this remark suggests that Defendants agreed that such cases "should" be included. Hoge's words do not indicate that Moderna agreed it was appropriate to include the additional (unblinded) cases, or that it was more accurate to include them, or that the FDA was correct in opting to include them.

Further undermining any inference of scienter, Plaintiff's counsel acknowledged at oral argument that Defendants may have had good reason to acquiesce in the FDA's request to add the additional cases, whether or not Defendants thought the FDA was right. The important thing for Moderna was to get its vaccine approved promptly, so it could get into the marketplace.

Arguing with the FDA about a few percentage points on the efficacy rate could have slowed down the FDA approval process:

> THE COURT: Well, they got [FDA approval] whether it was 83 or 78. They were well within the ball park --
>
> MR. BIGIN: Well within.
>
> THE COURT: -- to get approval for a new biologic.
>
> MR. BIGIN: Well within, your Honor.
>
> However, if they objected, they might not have made that deadline of being able to be marketable for the cold and flu season of the following year.

Docket No. 91 at 37:19–38:1.

As became clear at oral argument, Plaintiff asks this Court to draw inferences that the actual text of Hoge's statement will not support:

> THE COURT: So to rule in your favor here, I have to find that Hoge admitted not just that we agreed to go along with FDA because we thought it would be faster, easier, cheaper or otherwise expeditious or expedient, rather, but instead that I've got to look at that Hoge statement and say, he admitted in that statement that he knew that the numbers that he [had] been using were false.
>
> MR. BIGIN: Yes.

*Id*. at 51:12–19.

Hoge's statement is plainly *not* an admission of the sort that could satisfy the heightened pleading standard for scienter under the PSLRA. *Compare Leung v. bluebird bio, Inc.*, 599 F. Supp. 3d 49, 62–63 (D. Mass. 2022) (finding that statements by company officer "attempted to explain the FDA's position" and "did not constitute an admission of [the company]'s prior knowledge of" such position), *with Brennan v. Zafgen, Inc.*, 853 F.3d 606, 614 (1st Cir. 2017) ("[W]e have found the standard met where a complaint contains clear allegations of admissions, internal records or witnessed discussions suggesting that at the time they made the statements claimed to be misleading, the defendants were aware that they were withholding vital

information or at least were warned by others that this was so." (citation modified) (quoting *In re Bos. Sci. Corp. Sec. Litig.*, 686 F.3d 21, 31 (1st Cir. 2012))).

Plaintiff's attempt to construe Moderna's May 31, 2024, press release as an admission, *see, e.g.*, Complaint ¶ 81, falls short by an even wider margin. The press release stated, in relevant part:

> The FDA's approval of mRESVIA is based on positive data from the Phase 3 clinical trial ConquerRSV, a global study conducted in approximately 37,000 adults ages 60 years or older in 22 countries. The primary analysis with 3.7 months of median follow-up found a vaccine efficacy against RSV lower respiratory tract disease (LRTD) of 83.7% (95.88% Cl 66.0%, 92.2%). These results were published in The New England Journal of Medicine. A follow-up analysis of the primary endpoint was performed during FDA review, including cases that started before the primary analysis cut-off date but were not confirmed until afterward. The results were consistent with the primary analysis [VE 78.7% (Cl 62.9%, 87.8%)] and were included in the U.S. package insert.

Docket No. 72-15 at 2. There is nothing here that can plausibly be construed as an admission.

*3. Core Operations Theory*

In some circumstances, it is reasonable to infer that an individual defendant knew a statement was false if that statement concerns a matter so central to a company's business that company officers must have known it was false. This is the so-called "core operations" theory.

The contours of the "core operations" theory have not yet been fully developed in this circuit. *See In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 44 (1st Cir. 2017) (declining to "resolve the standard by which 'core operations' allegations may give rise to a strong inference of scienter"). As it stands, the "core operations" theory sometimes allows plaintiffs to take a step towards an inference of scienter: the theory is that "facts critical to a business's core operations . . . are so apparent that their knowledge may be attributed to the company and its officers." *Leung*, 599 F. Supp. 3d at 66 (alteration in original) (quoting *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 19 (D. Mass. 2004)).

Defendants argue that the core operations theory does not advance the ball for Plaintiff because mRESVIA was not part of Moderna's core operations. Docket No. 73 at 41; Docket No. 82 at 20. Furthermore, Defendants assert, even if we assume that Moderna's overall focus on the FDA approval process for mRESVIA was critical to its operations, there is a dearth of factual allegations to support an inference of scienter, apart from the alleged importance of mRESVIA. *See* Docket No. 73 at 41; Docket No. 82 at 20.

Plaintiff responds that mRESVIA was central to Moderna's business during the Class Period, so Defendants must have been monitoring the FDA approval process. *See* Docket No. 75 at 40. Plaintiff points to Hoge's purported admission as a "plus factor" that warrants resort to a core operations theory to find scienter. *See* Docket No. 75 at 41.

In the first place, mRESVIA is not to Moderna what Roomba is to iRobot. *See In re iRobot Corp. Sec. Litig.*, 527 F. Supp. 3d 124, 141 (D. Mass. 2021) (where "Roomba generated 90% of iRobot's revenue," core operations theory applicable, but even so, no scienter). Nor is mRESVIA analogous to the treatment at issue in *Dahhan v. OvaScience, Inc.*—a case upon which Plaintiff relies—where the defendant had "developed to the point of commercialization *only one potential treatment*," the one at issue in the challenged statements. *See* 321 F. Supp. 3d 247, 249 (D. Mass. 2018) (Talwani, J.) (emphasis added); *see also id.* at 255 ("[T]he successful commercialization of [the treatment] was critical for [defendant]'s success, as it was the company's only developed treatment."). As the Complaint alleges, Moderna's big product and revenue source was its COVID-19 vaccine, Spikevax. Complaint ¶¶ 25–26.

It is doubtful, to say the least, that mRESVIA should be considered part of Moderna's core operations. But even if we take at face value the Complaint's conclusory allegation that mRESVIA was a critical step in Moderna's effort to establish itself as a multi-product platform

company, Complaint ¶ 35, this doesn't make the mRESVIA efficacy figure a matter of core operations. Given that the difference between 83.7% and 78.7% wasn't expected to affect the FDA's approval decision, the inference points in the opposite direction.

Furthermore, district courts considering the issue have suggested that we must "hesita[te] to apply significant weight to 'core operations' allegations without other significant evidence of a defendant's intent or recklessness, or a 'plus factor.'" *Leung*, 599 F. Supp. 3d at 66 (quoting *In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 51 (D. Mass. 2016), *aff'd*, 857 F.3d 34 (1st Cir. 2017)). To illustrate what a compelling "plus factor" might look like, one judge in this district has pointed to the circumstances in *Crowell*, where "allegations of the improper booking and accounting of fraudulent sales, [were] buttressed by a 'plus factor'—an email pointing to the company's vice president as the author of the scheme." *In re A123 Sys., Inc. Sec. Litig.*, 930 F. Supp. 2d 278, 285 (D. Mass. 2013). Similarly, in *Dahhan*, not only did the company have only one (potentially) commercializable product, but it "completed a secondary public offering of the company's stock" during the class period. 321 F. Supp. 3d at 249–50. This is a classic scenario in which knowledge of falsity is coupled with an obvious motive to profit from the falsehood.

The biggest issue for Plaintiff, though, is that imputing knowledge to Defendants about Moderna's "core operations" doesn't gain any ground for Plaintiff's scienter theory. The "core operations" theory is primarily a mechanism for inferring knowledge of falsity; courts may presume that senior officials in a company are familiar with its "core operations." In finding that Plaintiff has plausibly alleged falsity, we have *already* assumed that Defendants were aware, by February 13, 2024, that including the additional data assembled on that date would result in computing a lower efficacy figure.

Unlike a typical "core operations" situation, Plaintiff is not seeking to impute to Defendants knowledge of their own operations. Rather, in order to make out a claim, Plaintiff needs to impute to Defendants some prescient knowledge about what figure the FDA would ultimately decide to adopt as the efficacy rate for mRESVIA. Plaintiff effectively concedes this when he writes, "[w]hat was critical to Moderna—and what investors cared about—was what [efficacy] the FDA was *going to approve* for labeling." Docket No. 75 at 23 (emphasis added). As discussed above, there are no well-pleaded factual allegations in the Complaint to support an inference that Defendants knew during the Class Period what efficacy figure the FDA would ultimately adopt. The "core operations" theory doesn't supply that missing link.

The cases that Plaintiff cites underscore the point that what's lacking here is any factual allegation to suggest that Defendants knew in February what the FDA would decide in May. The facts here are far afield from those in *Transkaryotic*, where the Defendants had "direct knowledge of the FDA's Complete Review Letter," and that letter "stated bluntly and at length that" the defendants' clinical studies "failed to demonstrate efficacy." *See In re Transkaryotic Therapies, Inc. Sec. Litig.*, 319 F. Supp. 2d at 156, 162. By the same token, while Plaintiff relies on the First Circuit's decision in *Construction Industry and Laborers Joint Pension Trust v. Carbonite, Inc.*, 22 F.4th 1 (1st Cir. 2021), the circumstances here are much closer to the situation in *Local No. 8 IBEW Retirement Plan & Trust v. Vertex Pharmaceuticals, Inc.*, 838 F.3d 76 (1st Cir. 2016), a case that the court in *Carbonite* identified as an example of a failed complaint. *See Carbonite*, 22 F.4th at 10. In *Vertex*, the complaint lacked allegations "that any defendant viewed" two different study findings "as incompatible" and further lacked any basis to infer that the defendants should have viewed the study results "as obviously wrong." *Vertex*, 838 F.3d at 82. The bare fact that the study was important to Vertex could not support any inference

helpful in establishing scienter. *Id.* at 82–83. In this case, Plaintiff has failed to allege that anyone in Moderna knew what the FDA would decide. Even if we assume that Defendants knew the inclusion of additional data would lower the efficacy figure, there is no allegation that anyone in the company was aware that the FDA would ultimately adopt that lower figure and no indication that the higher figure was obviously wrong.

Resorting to a "core operations" theory does nothing to lift Plaintiff's claims over the high threshold for pleading scienter under the PSLRA.

**B. *Lack of Motive to Falsify***

In considering an inference of scienter, an obvious focal point is motive. Did Defendants have anything to gain by misleading investors about the efficacy figures for mRESVIA? Here, the Complaint falls flat.

*1. Plaintiff's General Narrative of Motive*

The Complaint weaves a broad narrative about Moderna's challenges in entering the RSV vaccine market and persuading investors that the company was positioned to follow up on the blockbuster success of its COVID-19 vaccine. *See* Complaint ¶¶ 38–40, 48, 65, 118. On this foundation, Plaintiff argues that Defendants had "three intertwined motives: motive to differentiate mRESVIA as superior to the competition such that it would be commercially viable, motive to replace waning Spikevax revenue and validate the Company's thesis as a platform Company, and motive to avoid a weak bargaining position." Docket No. 75 at 37. These "intertwined motives" to portray Moderna's strength all boil down to the same thing: Plaintiff is hypothesizing a scenario in which the higher efficacy figure for mRESVIA was so critical to Moderna's business strategy that the Court should infer Defendants had a motive to conceal the lower efficacy figure from investors.

Even on the face of the Complaint, there are problems with Plaintiff's narrative that Defendants were intent on spinning a rosy tale about the prospects for mRESVIA. The Complaint itself acknowledges that Defendants highlighted for investors that they would face "competition from existing RSV vaccines," which they said could cause "difficulty achieving market share." Complaint ¶ 42. The 2023 annual report, from which the Complaint quotes, was published on February 23, 2024, and updated on March 15, 2024—during the Class Period. *See id.* ¶¶ 68, 70; *see also* Docket Nos. 72-9, 72-11. Although mere disclaimers cannot create a safe harbor for misleading public announcements, the fact that Moderna was already telling investors, *before* the lower efficacy figure was announced, that it anticipated "difficulty achieving market share" tends to vitiate, rather than support, any inference that Defendants intentionally concealed the lower efficacy figure in order to paint an unduly rosy picture for investors about Moderna's prospects for capturing a significant share of the market for RSV vaccines. Moreover, far from positioning mRESVIA as Moderna's only hope of replacing waning revenues from Spikevax, Defendants told investors about "45 programs currently in development, spanning infectious diseases, immuno-oncology, rare diseases and autoimmune diseases." Docket No. 72-9 at 6.

In an effort to cast his narrative as a compelling allegation of scienter, Plaintiff attempts to argue that Moderna had an urgent need to improve its revenue outlook, as opposed to a generic motive to earn profits. *See* Docket No. 75 at 37–38. The problem for Plaintiff is that the factual allegations of the Complaint don't point in that direction. The Complaint alleges that Moderna's revenues were sharply lower as the COVID-19 pandemic waned, but it does not allege that the company was cash-strapped or desperate for new investment. *See* Complaint ¶¶ 26–27 (alleging Moderna's total revenue was $18.5 billion in 2021, $19.3 billion in 2022, and

$6.8 billion in 2023). As such, the Complaint does not clear the "high bar for arguments of this sort." *Kader v. Sarepta Therapeutics, Inc.*, 887 F.3d 48, 60 (1st Cir. 2018).

To make out an inference of scienter, the First Circuit "require[s] something more than the ever-present desire to improve results, such as allegations that the very survival of the company was on the line." *Id.* (citation modified) (quoting *Corban*, 868 F.3d at 41). There is no "something more" in Plaintiff's broad-brush narrative about Moderna's efforts to expand its product offerings.[19]

*2. Lack of Motive to Mislead Investors During the Class Period*

The final, and conclusive, blow to Plaintiff's scienter allegations is that the chronology of the alleged fraud does not support—indeed, it powerfully undermines—any inference that Defendants stood to gain anything by misleading investors during the Class Period.

In weighing inferences of motive, context is critical. "[T]he significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint." *Tellabs, Inc.*, 551 U.S. at 325.

In this case, the Complaint is narrowly tailored around an allegation that Defendants made false statements during a two-and-a-half month period, from the time Defendants assembled data in response to the FDA's request until the date on which the FDA approved mRESVIA. *See* Docket No. 91 at 38:10–14 ("Their prior statements are fine. That's where we get a little confused in the overture of what's going on in the case. We didn't allege a case prior to the February class period.").

[19] In a bit of a sidestep, Plaintiff asserts that scienter may be "adequately alleged without allegations of the company being financially on the ropes." Docket No. 75 at 38. But that proposition would only help Plaintiff's cause if there were other adequate allegations of scienter.

So, the question is: What did Defendants stand to gain by misleading investors for that relatively brief period? This question is particularly pointed because Plaintiff's theory is that Defendants somehow anticipated, based on the FDA's request for additional data, that the FDA would ultimately adopt the 78.7% figure when it approved mRESVIA. If we assume for the sake of argument that Defendants knew as of February 13, 2024, that the higher figure was false, why would Defendants wish to deceive investors when such a deception was destined to be short-lived? What advantage could Defendants expect to gain by promoting a false efficacy figure if they knew all along that the "true" figure would be revealed upon the FDA's approval announcement?

In comparable circumstances, the First Circuit has noted the implausibility of an inference of scienter when an allegedly false statement is bound to be corrected in short order. *See Vertex*, 838 F.3d at 84 ("Announcing good results on such a study would have been clearly better for Vertex than announcing great results only to reduce them to good results by shortly thereafter confessing error, thereby harming the company's credibility and its reputation for competence.").

There are, of course, situations in which a company or its insiders may seek to profit by temporarily boosting the company's stock price. A company may sell stock to the public at the inflated price, or it may use shares (with an inflated price) as collateral for borrowing. By the same token, insiders may dump their shares ahead of an anticipated stock drop. But the Complaint here is bereft of allegations that could identify any such short-term motives to cash in on a transitory boost to Moderna's share price: There is no allegation of short selling, insider

trading, raising capital at an inflated valuation, or the like.[20] In some cases, short-term schemes (involving short-term motives) may be believable. But the allegations in this case undercut any such inference.

### C. *Conclusion on Scienter*

At bottom, the factual allegations in the Complaint do not support the requisite strong inference of scienter under any of the theories Plaintiff advances—whether those theories are considered separately or collectively. It simply does not suffice under the PSLRA to "amalgamate a series of sketchy brushstrokes and call it a van Gogh." *Quinones v. Frequency Therapeutics, Inc.*, 106 F.4th 177, 184 (1st Cir. 2024). Here, the inferences against scienter are far more compelling than any in favor.

Because the factual allegations of the Complaint lend more support to an innocent explanation than one of scienter, Plaintiff has failed under the PSLRA to allege a viable Section 10(b)/Rule 10b-5 claim.

## V. Other Theories of Liability

### *A. Scheme Liability*

To be liable under a scheme liability theory, a defendant must have acted with scienter. *Sec. & Exch. Comm'n v. Bio Def. Corp.*, No. 12-CV-11669-DPW, 2019 WL 7578525, at *21 (D. Mass. Sept. 6, 2019), *aff'd sub nom. Sec. & Exch. Comm'n v. Morrone*, 997 F.3d 52 (1st Cir. 2021). Because the Complaint does not adequately plead scienter, the Plaintiff's scheme liability theory cannot proceed.

[20] Even when such events are present, they do not automatically support a strong inference of scienter. *See Vertex*, 838 F.3d at 84 (rejecting inference of motive where "five defendants sold almost $32 million worth of stock" after overstated results were released, since innocent explanations for those sales were more compelling).

### *B. Control Person Liability*

Likewise, because "[a] section 20(a) claim is derivative of an underlying violation of the securities laws," the dismissal of the Section 10(b) and Rule 10b-5 claims must be accompanied by dismissal of the Section 20(a) claim. *Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*, 778 F.3d 228, 246 (1st Cir. 2015).

## CONCLUSION

For the forgoing reasons, I RECOMMEND that the Complaint be DISMISSED.

/s/ Paul G. Levenson
Paul G. Levenson
CHIEF U.S. MAGISTRATE JUDGE

Dated: August 31, 2026

## NOTICE OF RIGHT TO OBJECT

In accordance with Rule 3 of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts, the parties are advised that under the provisions of Federal Rule of Civil Procedure 72(b) or Federal Rule of Criminal Procedure 59(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. *See Keating v. Sec'y of Health & Hum. Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *see also Thomas v. Arn*, 474 U.S. 140 (1985).